ESTADO LIBRE ASOCIADO DE PUERTO RICO
TRIBUNAL DE APELACIONES
PANEL ESPECIAL

| | | |
|---|---|---|
| **CONSEJO DE TITULARES DEL CONDOMINIO VILLAS DE HATO TEJAS**<br><br>Apelante<br><br>v.<br><br>**MAPFRE PRAICO INSURANCE COMPANY**<br><br>Apelada | KLAN202300791 | **APELACION** procedente del Tribunal de Primera Instancia, Sala Superior de **Bayamón**<br><br>Civil Núm.: **BY2019CV05162**<br><br>Sobre: Seguros – Incumplimiento Aseguradoras Huracanes Irma / María |

Panel integrado por su presidente, el Juez Figueroa Cabán, el Juez Bonilla Ortiz y la Jueza Boria Vizcarrondo.

Boria Vizcarrondo, Jueza Ponente.

## SENTENCIA

En San Juan, Puerto Rico, a 3 de diciembre de 2024.

Comparece ante nos el Consejo de Titulares del Condominio Villas de Hato Tejas (Consejo de Titulares) y nos solicita, mediante el presente recurso de *Apelación Civil*, que revoquemos la *Sentencia*[1] emitida por el Tribunal de Primera Instancia, Sala Superior de Bayamón, el 20 de julio de 2023. Mediante la referida *Sentencia*[2], el foro sentenciador declaró **No Ha Lugar** al *Complaint*[3] presentado por el Consejo de Titulares, de igual forma, ordenó a MAPFRE PRAICO Insurance Company (MAPFRE) a satisfacerle al Consejo de Titulares la cuantía de ochocientos sesenta y nueve mil novecientos noventa y nueve dólares con setenta centavos ($869,999.70).

Por los fundamentos que discutiremos a continuación, confirmamos la sentencia apelada.

---

[1] Apéndice del Recurso de *Apelación Civil*, págs. 731-771. Notificada y archivada en autos el 21 de julio de 2023.
[2] *Íd.*
[3] Apéndice del Recurso de *Apelación Civil*, págs. 1-10.

**I**

El 5 de septiembre de 2019 el Consejo de Titulares presentó un *Complaint*[4] bajo incumplimiento de contrato, violaciones del Código de Seguros de Puerto Rico y daños. En síntesis, el Consejo de Titulares arguyó que debido al paso de los huracanes Irma y María, el Condominio Villas de Hato Tejas había sufrido daños estructurales, en su techo, sistema de HVAC, ventanas, espacios interiores y estructuras auxiliares. El Consejo de Titulares alegó, además, que había adquirido un seguro sobre la propiedad del condominio mediante la póliza CBP-008876277/00 por la que realizó un pago de $38,768.00 a favor de MAPFRE. Dicha póliza cubría los daños causados a la propiedad por *wind*, durante el periodo de enero 2017 a enero 2018. Luego del paso de los huracanes, la parte demandante presentó un reclamo ante MAPFRE, número 2017-12-02336, por todos los daños ocurridos a la propiedad, pero alegó que, debido a la inacción de la parte demandada, se vio en la obligación de contratar a Total Climas International, LLC para documentar y calcular los costos de reparación en la propiedad. Adujo que debido a la negativa de MAPFRE en satisfacer e investigar los daños, tuvo que presentar el reclamo ante el Tribunal de Primera Instancia.

En respuesta, el 13 de enero de 2020 MAPFRE presentó su *Contestación a la Demanda.*[5] En esencia la parte demandada negó los hechos plasmados por la parte demandante y levantó sus defensas afirmativas. De igual forma, alegó afirmativamente que atendió de manera diligente la reclamación presentada por la parte demandante y que los daños alegados por estos últimos eran exagerados, especulativos, inflados y excesivos.

---

[4] *Íd.*
[5] Apéndice del Recurso de *Apelación Civil,* págs. 11-21.

Luego de varios incidentes procesales, el 8 de junio de 2021 el Consejo de Titulares presentó una *Moción de Sentencia Sumaria Parcial*.[6] En síntesis, la parte demandante arguyó que procedía que se le ordenara a la parte demandada pagarle la cantidad de $100,680.15, ya reconocidas por esta última en su ajuste inicial, en concepto de pago adelantado al Consejo de Titulares. De igual forma, alegó que no eran en concepto de pago en finiquito y que la controversia principal giraría en torno a cuánto más dinero se le debía a la parte demandante según sus obligaciones bajo la póliza de seguro.

Por su parte, el 8 de julio de 2021 MAPFRE presentó su *Oposición a Solicitud de Sentencia Sumaria Parcial*.[7] En resumen, la parte demandada arguyó que no procedía el pago por adelantado solicitado por la parte demandante pues, en primer lugar, el Tribunal ya había evaluado los méritos de dicha controversia y había resuelto que no procedía ordenar el pago por adelantado. En segundo lugar, argumentó que el ajuste realizado para el año 2018 ya no estaba vigente pues en el mes de febrero de 2021 había presentado un segundo ajuste con una cantidad diferente. En tercer lugar, alegó que la cantidad exigida por la parte demandante permanecía ilíquida por lo cual no era exigible.

Así las cosas, el 4 de octubre de 2021 el foro primario emitió una *Sentencia Parcial*.[8] En esencia, el Tribunal de Primera Instancia concedió a la parte demandante el remedio solicitado, ordenando a MAPFRE el pago de $100,680.15.

Tras varios trámites procesales, MAPFRE presentó una *Moción de Desestimación Parcial por Falta de Jurisdicción* el 4 de abril de 2022. En resumen, la parte demandada alegó que procedía la

---

[6] Apéndice del Recurso de *Apelación Civil*, págs. 22-108.
[7] Apéndice del Recurso de *Apelación Civil*, págs. 109-127.
[8] Apéndice del Recurso de *Apelación Civil*, págs. 231-238.

desestimación de la segunda causa de acción instada por la parte demandante, es decir daños por violaciones al *Código de Seguros de Puerto Rico,* Ley Núm. 77 de 19 de junio de 1957, bajo los Artículos 27.020, 27.150, 27.161, 27.162, 27.164 (1) (b) (ii) y el Artículo 27.164 (1) (b) (iii), de la enmienda realizada por la Ley Núm. 247 de 2018. En particular, la parte demandada arguyó que la parte demandante presentó su demanda cuando aún no había culminado de cursar el término jurisdiccional de sesenta (60) días que le provee el Artículo 27.164 del Código de Seguros de Puerto Rico, 26 LPRA sec. 2716d, a la aseguradora, para atender las violaciones alegadas por la parte demandante.

En respuesta, el 25 de abril de 2022 el Consejo de Titulares presentó su *Oposición a "Moción de Desestimación Parcial por Falta de Jurisdicción".*[9]

El 14 de julio de 2022, MAPFRE presentó una *Moción para Suplementar y Reiterar Solicitud de Desestimación por Falta de Jurisdicción.*[10]

Por lo que el 1 de agosto de 2022, el Consejo de Titulares presentó una *Moción en Cumplimiento de Orden y Desistimiento sin Perjuicio de Segunda Causa de Acción de la Demanda.*[11] En dicho escrito, la parte demandante desistió de su segunda causa de acción bajo la Ley Núm. 247 de 2018, *Código de Seguros de Puerto Rico.*

El 6 de agosto de 2022 el Tribunal de Primera Instancia emitió una *Sentencia Parcial*[12] en la cual declaró Con Lugar *Moción en Cumplimiento de Orden y Desistimiento sin Perjuicio de Segunda Causa de Acción de la Demanda.*[13]

---

[9] Apéndice del Recurso de *Apelación Civil,* págs. 286-287.
[10] Apéndice del Recurso de *Apelación Civil,* págs. 400-401.
[11] Apéndice del Recurso de *Apelación Civil,* págs. 402-403.
[12] Apéndice del Recurso de *Apelación Civil,* págs. 404-405. Notificada y archivada en autos el 8 de agosto de 2022.
[13] Apéndice del Recurso de *Apelación Civil,* págs. 402-403.

El juicio en su fondo se celebró los días 23, 24, 25, 26, 27 y 30 de enero de 2023; 1, 2 y 3 de febrero de 2023 y el 1, 2 y 3 de mayo de 2023. Durante el juicio la parte demandante presentó los siguientes testigos y peritos; (1) la señora Suzette Berríos, (2) el señor Juan Méndez; (3) el señor Dort Rothafel, (4) el señor Omar Acevedo Avilés y los peritos (5) Ingeniero Roberto López Esquerra y (6) el señor Thomas Irmiter. Por su parte, la parte demandada presentó el testimonio del (1) señor Mario R. Oronoz y del (2) señor Omar Acevedo Avilés y del perito (3) Ingeniero William Rosario Chárriez. A continuación, hacemos un resumen de los testimonios de algunos testigos y peritos, para mejor comprensión. En primer lugar, la parte demandante presentó el testimonio de:

### Thomas Irmiter (Perito de la parte demandante)

El señor Thomas Irmiter comenzó testificando que trabajaba para Forensic Building Science (FBS) como director ejecutivo y era consultor de fallos de construcción de edificios.[14] Atestiguó que FBS se dedicaba a llevar a cabo inspecciones de diferentes tipos de estructuras para verificar si estas estaban en cumplimiento con los códigos para daños causados por desastres, vicios de construcción, entre otras cosas, también expresó que hacía consultoría para litigios como perito y que llevaba cuarenta (40) años de experiencia en ese campo.[15] Entre los casos que ha intervenido se encuentran aquellos casos relacionados a huracanes, vicios de construcción y fuegos.[16] Ha fungido como perito en diferentes tribunales, incluso en Puerto Rico donde fungió como perito de causalidad de vicios de construcción, experto de códigos de construcción, estimado y costos, específicamente, en estimados de costos de reconstrucción.[17] Atestiguó que con el propósito de identificar

---

[14] Transcripción de la Prueba Oral (en adelante, TPO), págs. 329-330.
[15] *Íd.* págs. 330-332.
[16] *Íd.* págs. 332-333.
[17] *Íd.* pág. 334.

daños, a lo largo de su carrera, ha inspeccionado alrededor de diez mil (10,000) propiedades, esto incluye hogares particulares, edificios comerciales, bancos, municipios, entre otros.[18] Como parte de su preparación académica contaba con un bachillerato en inglés y una licencia de códigos de construcción.[19] Testificó que era parte del *International Code Council* por lo que recibía actualizaciones semanales de los cambios que se recomiendan para códigos de construcción en diferentes jurisdicciones, incluyendo a Puerto Rico.[20] Que estaba familiarizado con *Xactimate* y que lo había utilizado como base para estimar el costo para construir y reparar.[21] Referente a su experiencia a través de FBS en Puerto Rico, había inspeccionado alrededor de cuatrocientos ochenta y tres (483) edificios en Puerto Rico y ochenta y ocho (88) u ochenta y nueve (89) de ellos eran asociaciones de condominios.[22] Testificó que los casos que investigó en Puerto Rico estaban relacionados al Huracán María.[23] Referente a la preparación de estimados en Puerto Rico, atestiguó que en la mayoría de ellos se había utilizado la plataforma *Xactimate* para preparar los estimados de los casos.[24] Que utilizaba la plataforma *Xactimate* para preparar los estimados en Puerto Rico, por ser aceptada en los casos que ha participado en los tribunales y por ser una herramienta confiable. De igual forma alegó que además de realizar el estimado con la plataforma *Xactimate* se buscaban tres (3) licitaciones adicionales.[25]

Atestiguó que se utilizaban en los estimados de los casos de Puerto Rico bajo la plataforma *Xactimate,* la lista de precios de San Juan.[26] Por otra parte, aclaró que en cuanto a la lista de precios de

---

[18] *Íd.* pág. 339.
[19] *Íd.* págs. 343-344.
[20] TPO, pág. 345.
[21] *Íd.* págs. 354-357.
[22] *Íd.* págs. 363-364.
[23] *Íd.* pág. 367.
[24] *Íd.* págs. 367-368.
[25] *Íd.* págs. 368-369.
[26] *Íd.* pág. 376.

*Xactimate* en Puerto Rico, no habían ido al mercado a pedir propuestas de licitación, pero que gracias a trabajos hechos por propietarios individuales pudo observar recibos reales.[27] Declaró haber sido descalificado como perito en dos ocasiones en caso de vicios de construcción.[28] Además, haber sido cualificado como perito en más de cien (100) casos sobre daños a propiedad causados por vientos o tormentas de viento y agua.[29]

A preguntas de la parte demandada, testificó que no es ingeniero y que no había tomado cursos de educación continua en Puerto Rico.[30] Atestiguó que en parte sí fue contratado para evaluar el edificio del Condominio Villas de Hato Tejas y determinar si existían daños causados por el huracán María, cuantificarlos y producir un estimado e informe.[31] Además, testificó que antes de ser contratado por el Bufete Rainzer Lee no había sido perito de causalidad de daños ni causalidad en Puerto Rico ni haber participado en ningún proyecto de construcción ni de reparación en Puerto Rico.[32]

Declaró que FBS fue contratado conjunto a Entech y el ingeniero Roberto López para llevar a cabo una evaluación del Condominio Villas de Hato Tejas, para determinar si hubo daños a raíz del paso de María y cuantificarlos.[33] Que inspeccionó conjunto al personal de Entech el Condominio Villas de Hato Tejas. Que redactaron un informe de causalidad, que fue evaluado por el ingeniero Roberto López para llegar a un informe final.[34] Aclaró que para realizar el estimado utilizaron fotos tomadas por FBS y Entech, fotos tomadas por Total Claims, medidas hechas a todo el edificio

---

[27] *Íd.* pág. 377.
[28] *Íd.*
[29] TPO, pág. 384.
[30] *Íd.* págs. 389-390.
[31] *Íd.* págs. 398-399.
[32] *Íd.* págs. 399-400.
[33] *Íd.* pág. 427.
[34] *Íd.* págs. 428-429.

por Total Claims, recibos entregados por los titulares, notas de campo, además, del informe de causalidad preparado por el ingeniero Roberto López.[35] Testificó que el informe de causalidad consistía de tres partes: (1) un informe narrativo sellado por el ingeniero, (2) una bitácora de fotos y (3) estimados.[36]

El perito testificó que la metodología llevada a cabo para inspeccionar el Condominio Villas de Hato Tejas consistió en inspeccionar techos, el exterior, cada uno de los edificios, cada una de las áreas individuales y áreas comunes.[37] De igual forma, los inspectores se dividieron en grupos de dos, en el cual uno de los inspectores se dedicaba a tomar fotografías y el otro a tomar notas y hacer medidas.[38] Declaró que hay ciento noventa (190) unidades en el Condominio Villas de Hato Tejas, de las cuales lograron inspeccionar ciento sesenta (160).[39] Que las razones por las que se quedaron sin inspeccionar algunas unidades fueron porque algunos propietarios se negaron a participar o no estuvieron disponibles.[40] La evaluación llevada a cabo para aquellas unidades que no fueron inspeccionadas consistió en realizar una evaluación de los exteriores de estas en relación a la proximidad de estas unidades a unidades que sí fueron inspeccionadas, en un proceso llamado extrapolación, el cual ha sido aceptado por los tribunales como un acercamiento razonable para determinar en términos generales daños.[41] Para llegar a sus conclusiones, el perito atestiguó que analizaron en primer lugar cuándo fue que se construyó el edificio y evaluaron las disposiciones del código de construcción vigente, para ese entonces. Con dicha evaluación concluyeron que las unidades fueron construidas para aguantar vientos de noventa y cinco (95) millas por

---

[35] *Íd.* págs. 430-431.
[36] *Íd.*
[37] TPO, pág. 452.
[38] *Íd.* págs. 452-453.
[39] *Íd.* pág. 453.
[40] *Íd.* págs. 453-454.
[41] *Íd.* págs. 454-455.

hora, por lo que vientos mayores podrían ocasionar daños. Según el análisis realizado en la referida evaluación las ráfagas de viento ascendieron a ciento cuarenta y siete (147) millas por hora.[42] Declaró que los daños relacionados por el huracán María identificados en el  Condominio Villas de Hato Tejas fueron revestimientos de las azoteas, grietas, grietas en los armazones de techo y parapetos, daños a las puertas y ventanas, grietas interiores en paredes estructurales secundarias, grietas interiores en plafones y en paredes no estructurales, daños causados por agua al plafón y ventas,  hongos, daños a gabinetes, daños a losas en el piso, entre otros.[43]

Para determinar los *means and methods* o la metodología de reparación, el perito atestiguó que se basó en medios y métodos utilizados en proyectos similares realizados en todos los Estados Unidos, y conjunto al ingeniero Roberto López llegaron a unas partidas más razonables que se ajustaran a las tareas que se llevarían a cabo.[44]

Relativo a los estimados de daños por unidades no inspeccionadas, el perito declaró que son necesarias incluirlas en el estimado para poder devolver la propiedad a la condición antes de la perdida y para indemnizar a los dueños adecuadamente y cumplir con los códigos del Departamento de Vivienda de Puerto Rico.[45]

Testificó que el estimado presentado por ROV le pareció artificialmente bajo, que no incluía fotografías, que la selección y alcances de trabajos que se hicieron dentro de *Xactimate* no fueron correctas al igual que entendió que los impuestos se calcularon de manera errónea.[46] Continuó declarando que en el estimado de ROV

---

[42] *Íd.* págs. 458-460.
[43] TPO, págs. 460-461.
[44] *Íd.* págs. 515-517.
[45] *Íd.* págs. 646-648.
[46] *Íd.* págs. 674-676.

había una falta de condiciones generales que no permitían prevenir la exposición a materiales peligrosos.[47]

A preguntas de la parte demandante, el perito testificó que el estimado original de FBS para las reparaciones del Condominio Villas de Hato Tejas era de aproximadamente catorce millones de dólares ($14,000,000.00).[48] Que luego de revisarlo el estimado bajó a ocho millones ochocientos mil dólares ($8,800,000.00).[49] Que los abogados de la parte demandante le informaron que la póliza no tenía cubierta *ordinance or law*.[50] Testificó que en su opinión los trabajos que fueron modificados, luego de que la representación legal de la parte demandante le comentara que la póliza no tenía cubierta *ordinance or law*, debían hacerse como estaban contenidos en el estimado original.[51] Por lo que entendía el estimado admitido en evidencia no cumplía con los códigos vigentes de construcción.[52] Relativo al método de extrapolación declaró que ha sido aceptado por algunos tribunales, pero que no tiene conocimiento si se ha aceptado en Puerto Rico.[53] Que la inspección visual o física era ciertamente más confiable que la extrapolación y que al utilizar esta metodología era posible llegar a una conclusión errónea.[54]

### *Ingeniero Roberto López (Perito de la parte demandante)*

El ingeniero Roberto López comenzó atestiguando que su participación en este caso fue la preparación del informe.[55] Testificó que realizó una inspección de la propiedad, recopiló data de la propiedad para analizar la parte histórica, de igual forma realizó un estimado de costos preparado en la plataforma *Xactimate* y por el equipo de FBS.[56] Sobre el estimado de costos, declaró que revisó el

---

[47] *Íd.*
[48] *Íd.* pág. 696.
[49] *Íd.*
[50] TPO pág. 712.
[51] *Íd.* pág. 713.
[52] *Íd.* págs. 713-714.
[53] *Íd.* pág. 723.
[54] *Íd.*
[55] *Íd.* pág. 786.
[56] *Íd.*

estimado, entre las cosas que revisó estuvieron los impuestos, *soft cost,* las actividades necesarias para reparar y precios unitarios entre otros.[57] Que las actividades necesarias para reparar eran producto del inventario de daños creado, pues crearon una metodología de reparación de aquellos elementos que son necesarios restaurar.[58] Declaró que los *soft cost* son aquellos gastos en los cuales el contratista tiene que incurrir a la hora de realizar el proyecto, en específico, los *general conditions,* los árbitros que se le paga al municipio al momento de comenzar una obra, el levantar el permiso para la construcción como también lo son los impuestos (*B2B)* que paga el contratista como parte de sus servicios.[59] Lleva veintiún años (21) siendo ingeniero civil y actualmente es presidente de Entech, de igual forma, tuvo experiencia en la industria de seguros y con los ajustadores públicos.[60]

Declaró que para el estimado preparado para el Condominio Villas de Hato Tejas se utilizó una lista de precios del año 2019.[61] Testificó que al comparar los precios del año 2019 con los precios de la actualidad hubo un aumento de aproximadamente un treinta por ciento (30%).[62] Para emitir el estimado en este caso revisó los estimados y fotos brindadas por Total Claims y unos planos que existían.[63] Referente a las inspecciones, el perito declaró que examinaron toda la propiedad y que su participación se dio el primer día de inspecciones en donde examinó los techos, el edificio en su área exterior y las áreas comunes.[64]

Relativo a las partidas incluidas en el estimado sobre impuestos, seguros y permisos, el perito atestiguó que estas incluían

---

[57] *Íd.* págs. 789-791.
[57] *Íd.* págs. 789-791.
[58] *Íd.* págs. 791-792.
[59] TPO págs. 792-793.
[60] *Íd.* págs. 793-795.
[61] *Íd.* págs. 802-803.
[62] *Íd.* pág. 804.
[63] *Íd.*
[64] *Íd.* pág. 805.

la póliza del Fondo del Seguro del Estado necesario para que el contratista pudiera realizar la obra, los arbitrios de construcción, patente municipal, los arbitrios a pagar basados en el costo de la obra de construcción y el *business to business.*[65]

En el contra interrogatorio, el perito declaró que antes del huracán María nunca había sido contratado como perito de desastres naturales.[66] Atestiguó que antes del huracán María nunca había utilizado la plataforma *Xactimate.*[67] De igual forma, testificó que al presente Entech no utilizaba *Xactimate* para realizar sus estimados.[68]

El perito testificó no recordar haber tomado notas de campo ni fotografías de la propiedad el día que compareció a examinar.[69] Declaró, además, que estar de acuerdo en que las inspecciones físicas o visuales eran más confiables que la extrapolación.[70] Que la utilización de la metodología de la extrapolación podría llevar a conclusiones erróneas.[71] Declaró que Entech no utilizaba en todos sus estimados la metodología de extrapolación, y señaló que en este caso solo fue utilizado para evaluar los daños ocasionados a las ventanas. [72] Por otro lado, testificó que no en todos los estimados de Entech se incluía una partida de daños a apartamentos que no fueron inspeccionados.[73]

En segundo lugar, la parte demandada presentó el testimonio de:

***Ingeniero William Rosario Chárriez (Perito de la parte demandada)***

---

[65] *Íd.* págs. 817-818.
[66] *Íd.* pág. 826.
[67] TPO pág. 829.
[68] *Íd.* pág. 831.
[69] *Íd.* pág. 857.
[70] *Íd.* pág. 935.
[71] *Íd.* pág. 936.
[72] *Íd.* pág. 941.
[73] *Íd.* pág. 944.

El ingeniero William Rosario Chárriez testificó que es ingeniero electricista licenciado, y que tomó cursos ofrecidos por FEMA relacionados a atender situaciones de emergencias, cómo establecer prioridades y que tipos de cuidados se debe tener.[74] Que para esa fecha mantenía un contrato con ROV a través de la compañía RelyCorp, quiénes ofrecían servicios de ingeniería.[75] Atestiguó que conjunto a RelyCorp había realizado trabajos civiles, de construcción, de remodelación y expansión a edificios, entre otros.[76] Que luego del huracán María el primer proyecto que realizó con RelyCorp fue elaborar un inventario y estimado de daños de la compañía de AT&T y telecomunicaciones.[77] Declaró que cuando trabajó para la compañía ICF realizó inventarios de daños y estimados de costos de reparación en propiedades del gobierno o en sus oficinas.[78] Que cuando entró a ROV comenzó a hacer inspecciones a más de treinta (30) condominios, en donde se realizó inventario de daños, puertas, ventanas, pisos, paredes, pintura, entre otros.[79] De igual forma, declaró que trabajó realizando informes periciales de las inspecciones hechas.[80] Referente a su labor en la compañía ICF, expresó que realizó inventarios de daños y estimados de costos de reparación en propiedades del gobierno que se le presentaban a FEMA para que se aprobaran fondos.[81] El perito testificó que bajo los servicios que brindó a través de ROV realizó reportes periciales, en específico, comentó haber realizado treinta y cinco (35) informes de condominios y complejos.[82] Además, haber participado en juicios y deposiciones.[83]

---

[74] *Íd.* págs. 1206-1207.
[75] *Íd.* pág. 1210.
[76] TPO págs. 1212-1213.
[77] *Íd.* pág. 1213.
[78] *Íd.*
[79] *Íd.* págs. 1214-1215.
[80] *Íd.*
[81] *Íd.* pág. 1218.
[82] *Íd.* pág. 1221.
[83] *Íd.*

Respecto a las inspecciones que realizó con ROV en varios condominios, el perito declaró que se presentaba a los diferentes apartamentos realizaba preguntas, inspeccionaba, tomaba notas de campo y medía el lugar.[84]

Sobre su experiencia laboral previo a RelyCorp, expresó que se dedicó durante treinta y dos años (32) a la industria de telecomunicaciones.[85]

En el caso del Condominio Villas de Hato Tejas, testificó que fue contratado para hacer un reporte pericial de los daños que allí ocurrieron.[86] Atestiguó que utilizó toda la información que estaba a su disposición, entre estas, la recopilada por ROV en las inspecciones. Que visitó un día el Condominio Villas de Hato Tejas para familiarizarse con el mismo, donde visitó todas las áreas exteriores, pero no los apartamentos en sí pues no habían apartamentos disponibles para inspección.[87]

Declaró que durante los treinta (30) años que estuvo en la empresa de las telecomunicaciones, no había inspeccionado los daños causados por un huracán o por vientos en un condominio.[88] Que antes de proveer servicios a ROV, a través de RelyCorp, no había realizado reportes periciales como el que fue hecho para este caso.[89] Como parte de su reporte se incluyó un estimado de daños con el formato de *Xactimate*, pero que la conversión de *Excel* a *Xactimate* no fue realizada por el perito.[90]

Para preparar el informe pericial, el perito declaró que utilizó varios reportes y fuentes de información, como el reporte de NOAA y el *National Weather Service* sobre el huracán María, de igual forma, utilizó toda la información suministrada por los peritos de la parte

---

[84] *Íd.* págs. 1222-1223.
[85] TPO pág. 1227.
[86] *Íd.* pág. 1231.
[87] *Íd.* págs. 1233-1234.
[88] *Íd.* págs. 1238-1239.
[89] *Íd.* pág. 1246.
[90] *Íd.* págs. 1257.1258.

demandante, la información levantada por los inspectores de ROV y fotos de *Google Earth.*[91] Que la sección narrativa del informe pericial fue preparada por el perito.[92] En términos generales, el perito declaró que se identificaron daños al Condominio Villas de Hato Tejas ocasionados por el huracán María.[93] Solo inspeccionaron ciento sesenta (160) apartamentos de los ciento noventa y dos (192) apartamentos que componen el condominio pues se encontraron en situaciones en donde la persona que vive el apartamento no se hacía disponible, no permitieron el acceso porque la persona no estaba disponible o simplemente rechazaban la inspección.[94] El perito testificó que la práctica de ROV consistía en que debían ver el daño para poder estimarlo, por lo que el daño que no se pudo identificar o no existía evidencia para identificarlo, no fue considerado en el informe.[95]

El perito testificó que supo de la existencia de *Xactimate,* pues los peritos de la parte demandante presentaron sus hallazgos en esa plataforma, por lo que transfirieron toda la información recopilada en *Excel* a *Xactimate* para poder facilitar la comparación de hallazgos entre ambos.[96] Referente a la cotización de pinturas en Puerto Rico, el perito testificó que en la isla cuando un contratista establece un precio para realizar cualquier actividad se sobreentiende que este va a realizar todas las tareas relacionadas con la relativa actividad, contrario a *Xactimate* que añade unos costos adicionales que no van acorde con la realidad de cómo se trabaja en Puerto Rico.[97]

Referente a los daños estructurales, el perito expresó que, ninguno de los inspectores de ROV identificó daños a la estructura del Condominio Villas de Hato Tejas, e incluso, en ninguna nota de

---

[91] TPO págs. 1277-1278.
[92] *Íd.* pág. 1279.
[93] *Íd.* págs. 1282-1283.
[94] *Íd.* págs. 1286-1288.
[95] *Íd.* pág. 1293.
[96] *Íd.* págs. 1300-1301.
[97] *Íd.* págs. 1306-1309.

campo, fotografía o tabla de *Excel* se hacía alusión a daños estructurales en el complejo de vivienda.[98]

Por otro lado, sobre el reporte de *Xactamite* presentado por los peritos de la parte demandante, el perito declaró que le llamó la atención que estos pudieron estimar treinta y ocho (38) apartamentos que no vieron y no identificaron, con una cantidad ascendente de cuatrocientos noventa y tres mil trecientos dos dólares ($493,302.00).[99] El perito opinó que la técnica de extrapolación no es realizar un trabajo responsable.[100]

En términos generales, el perito declaró que las diferencias significativas entre el estimado de FBS y Entech contra el estimado de ROV eran las siguientes: (1) FBS y Entech realizaron reclamaciones de apartamentos que no inspeccionaron; (2) FBS y Entech aumentaron sus números añadiendo una serie de trabajos misceláneos que no iban acorde con la forma en la que se hacía construcción en Puerto Rico; (3) FBS y Entech añadieron partidas de las cuales no tenían evidencia y lo justificaron alegando que *Xactimate* lo proveía; (4) FBS y Entech adjudicaron al huracán María todos los problemas que tenía el condominio.[101]

En su contrainterrogatorio, el perito declaró que no participó con el grupo que inspeccionó el condominio, pero sí visitó un día el lugar.[102] Adujo que no realizó un *cross reference*, es decir, para las unidades que ROV no pudo inspeccionar, no utilizó las fotografías recopiladas por FBS para adjudicar daños.[103] Que no pudo verificar las fotografías de FBS para confirmar que aquellos daños que este estimó eran reales o representativos de lo que se veía en las unidades.[104] No discutió con ROV que algunas partidas provistas

---

[98] TPO págs. 1331-1332.
[99] *Íd.* págs. 1354-1355.
[100] *Íd.* págs. 1355-1356.
[101] *Íd.* págs. 1451-1453.
[102] *Íd.* págs. 1460-1461.
[103] *Íd.* págs. 1467-1468.
[104] *Íd.* pág. 1469.

por *Xactimate* eran precios que no se ajustaban a la realidad de Puerto Rico.[105] De igual forma, declaró que no existía una relación directa entre los vientos causados por el huracán y los daños del condominio.[106] Que su aproximación era que solo un cinco (5%) porciento de los edificios sufrieron daños a raíz del huracán María.[107]

Así las cosas, luego de haber celebrado el juicio en su fondo y aquilatado la prueba, el 21 de julio de 2023 el Tribunal de Primera Instancia emitió su *Sentencia*.[108]  En esencia, el foro *a quo* declaró **No Ha Lugar** la reclamación presentada por el Consejo de Titulares y ordenó a MAPFRE a satisfacer a la parte demandante la suma de ochocientos sesenta y nueve mil novecientos noventa y nueve dólares con setenta centavos ($869,999.70). El foro primario emitió las siguientes determinaciones de hechos estipuladas por ambas partes:

> 1. Para la fecha del paso del Huracán María, estaba en vigor la póliza de seguros CBP-008876277-7/000 expedida por MAPFRE a favor del Consejo de Titulares (la "Póliza").

> 2. La Póliza ofrecía cubierta para la propiedad conocida como Condominio Villas de Hato Tejas, ubicada en Carr. 862, Km. 2.6, Bo. Pájaros, Hato Tejas, Bayamón, Puerto Rico (la "Propiedad").

> 3. El periodo de vigencia de la Póliza era de 3 de enero de 2017 a 3 de enero de 2018.

> 4. Según las declaraciones de la póliza, la cubierta, la cual tenía un límite agregado de $24,084,661.00, se detalla de la siguiente forma:

| Localidad | Estructura | Descripción | Límite |
|---|---|---|---|
| 1 | 1 | Bldg. 1: Four Stories All Concrete Building | $2,731,125.00 |
| 1 | 2 | Bldg. 2: Four Stories All Concrete Building | $1,820,954.00 |
| 1 | 3 | Bldg. 3: Four Stories All Concrete Buildig | $2,731,125.00 |

---

[105] TPO pág. 1475.
[106] *Íd.* pág. 1560.
[107] *Íd.*
[108] Apéndice del Recurso de *Apelación Civil*, págs. 731-771. Notificada y archivada en autos el 21 de julio de 2023.

| 1 | 4 | Bldg. 4: Four Stories All Concrete Building | $1,820,954.00 |
|---|---|---|---|
| 1 | 5 | Bldg. 5: Four Stories All Concrete Building | $2,731,125.00 |
| 1 | 6 | Bldg. 6: Four Stories All Concrete Building | $1,820,954.00 |
| 1 | 7 | Bldg. 7: Four Stories All Concrete Building | $2,731,125.00 |
| 1 | 8 | Bldg. 8: Four Stories All Concrete Building | $2,731,125.00 |
| 1 | 9 | Bldg. 9: Four Stories All Concrete Building | $2,731,125.00 |
| 1 | 10 | WATER PUMPS | $174,000.00 |
| 1 | 10 | ELECTRICAL TRANSFORMERS | $260,400.00 |
| 1 | 10 | POOL/POOL FENCE/PUMP ENCL. | $88,604.00 |
| 1 | 10 | MULTI-USE BLDG | $159,724.00 |
| 1 | 10 | MAILBOX STATION | $18,480.00 |
| 1 | 11 | GUARD HOUSE | $12,180.00 |
| 1 | 11 | ILUMINATION POLES | $105,000.00 |
| 1 | 11 | VEHICULAR GATE/ FENCES | $421,800.00 |
| 1 | 11 | WASTE BIN | $4,538.00 |
| 1 | 11 | TELE ENTRY/SURVEILLANCE | $9,000.00 |
| 1 | 12 | PAVED AREAS/ WHEEL STOP/ EXT. BENCHES/STAIR | $373,730.00 |
| 1 | 12 | WALKING TRACK/ FENCES | $416,000.00 |
| 1 | 12 | AIR EXHAUST | $63,000.00 |
| 1 | 12 | BUSINESS PERSONAL PROPERTY | $20,000.00 |
| 1 | 13 | LANDSCAPING | $50,000.00 |
| Total: | | | $24,084,661.00 |

5. El huracán María impactó a Puerto Rico el 20 de septiembre de 2017.

6. El huracán María causó daños a la Propiedad.

7. El número de la reclamación del Consejo es 20171202336.

8. El 31 de octubre de 2017, el Consejo contrató a Century Adjusting, Inc., sucesor del cual fue Total Claims International, LLC, para la preparación de un estimado de daños a la Propiedad a causa de los huracanes Irma y María.

9. El 5 de noviembre de 2018, MAPFRE, a través de Mario Oronoz, envió un correo electrónico a Total Claims International, LLC, que lee:

> *Estimado señor Giménez,*
>
> *Acompaño la oferta de MAPFRE relacionada con la reclamación de referencia:*
>
> > *a. Daños Reconocidos $506,484.30*
> > *b. Deducibles aplicables $454,794.26*
> > *c. Pago neto $100,680.15*
>
> *Acompaño tabla con el detalle de los daños y resumen de los límites y deducibles y proof of loss para ser devuelto juramentado.*
>
> *Atentamente,*
>
> *MARIO R. ORONOZ*

10. El 21 de enero de 2019, el Sr. Juan E. Cabán, Ajustador de Reclamaciones de Propiedad de MAPFRE, cursó una comunicación al asegurado, que lee:

> *Estimados señores:*
>
> *Con relación a la reclamación en referencia, el pasado 4 de octubre de 2017, se reporta reclamación en nuestras oficinas debido al paso del huracán María.*
>
> *Desde hace varios meses hemos estado trabajando la valorización y ajuste de la propiedad asegurada con su representante TOTAL CLAIMS INTERNATIONAL LLC., Sr. Juan Méndez. El pasado 5 de noviembre de 2018, a través del Sr. Mendez se hizo oferta final por $100,680.15 luego de aplicadas las condiciones del contratado de seguros sin recibir contestación alguna de su parte y/o representante.*
>
> *Dado al tiempo transcurrido sin lograr contactarlos, le informamos que en los próximos 10 días de no lograr hacer contacto procederemos a cerrar nuestro expediente sin más acción. De usted requerir la re-apertura de su reclamación favor de*

*solicitarlo por escrito. Puede comunicarse vía e-mail a jcaban@mapfrepr.com.*

*Cualquier duda que surja del contenido de esta misiva, puede comunicarse con a su mejor conveniencia, a través del 250-6500 Ext. 6293.*

*Cordialmente,*

*Juan E. Cabán Collazo*

11. El 25 de enero de 2019, Adriana W. Lyden, de Total Claims International, LLC, envió un correo electrónico a MAPFRE que lee:

*Good afternoon,*

*Please find attached Total Claims International's response to the offer received on January 21, 2019.*

*We await your prompt response.*

*Best regards,*

*Adriana W. Lyden*

12. Junto al correo electrónico de 25 de enero de 2019, la representante de Total Claims incluyó como anejo una carta fechada 25 de enero de 2019, y suscrita por Gerrard Smith de Total Claims International, LLC, la cual lee:

*1/25/2019*
*Edificio Mapfre*
*Urb. Tres Monjitas Industrial*
*297 Ave. Carlos Chardón, San Juan PR 00918*
*1410*
*P.O. Box 70333 San Juan PR 00936-8333*

*RE: Owner: Condominio Villas De Hato Tejas*
*Policy: CBP-008876277-7/000*
*Claim: 20171202336*
*D.O.L.: September 20, 2017*

*Dear Juan Cabán Collazo,*

*Thank you for your letter correspondence dated 01/21/2019. We are in fact in receipt of your offer in the amount of $100,680.15. As you know, on 04/26/2018 an estimate of damages due to Hurricane Maria was submitted to you in the amount of $17,186,034.65 on behalf of your insured. Since the submittal of this estimate we have made multiple attempts to contact your office both by phone and in person to discuss this matter, to no avail. With that being said, please advise if this offer is being issued as an undisputed payment and furthermore, how would you like to proceed to settle the differences between the*

*estimate submitted and the offer you presented our client. We are anxiously awaiting your reply.*

*Thank You,*

*Gerrard Smith*
*Catastrophe Department*
*Total Claims International, LLC*

13. El 8 de febrero de 2019, el Sr. Gerrard Smith de Total Claims International, LLC, envió un correo electrónico al Sr. Juan Cabán de MAPFRE, que lee:

*Good Afternoon,*

*This is a follow up to the below Registered Email dated January 25thwhich can be referenced below responding to the offer received on January 21st 2019. To date, no response has been received regarding said matter. Please contact me or anyone at our offices as soon as possible to we may advance this claim to a final settlement.*

*Thank you,*

*Gerrard Smith*

14. El 14 de febrero de 2019, el Sr. Gerrard Smith de Total Claims International LLC, envió un correo electrónico a Juan Cabán de MAPFRE, entre otros, que reza:

*Good Morning,*

*This is the second follow up to the below Registered Email dated January 25th, which can be referenced below, responding to the offer received on January 21st, 2019. To date, no response has been received regarding said matter. Please contact me or anyone at our offices as soon as possible to we may advance this claim to a final settlement.*

*We anxiously await your response.*

*Thank you,*

*Gerrard Smith*

15. El 28 de febrero de 2019, el Sr. Gerrard Smith de Total Claims International LLC, envió un correo electrónico al Sr. Juan Cabán de MAPFRE, entre otros, que reza:

*Good Afternoon,*

*This is the third follow up to the below Registered Email dated January 25th, which can be referenced below, responding to the offer received on January 21st, 2019. To date, no response has been received regarding said matter. For your*

*convenience, I attached said letter dated January 25th, 2019, for review. Please contact me or anyone at our offices as soon as possible to we may advance this claim to a final settlement.*

*We anxiously await your response.*

*Thank you,*

*Gerrard Smith*

Por otro lado, el Tribunal emitió las siguientes determinaciones de hechos luego de aquilatar la prueba:

16. El Condominio Villas de Hato Tejas está compuesto por 24 edificios de cuatro pisos cada uno, para un total de 192 apartamentos.

17. La presidenta del Consejo, desde octubre de 2020 hasta el presente, es la Sra. Suzette Berríos, quien es además titular del apartamento 23-202. Antes de ser presidenta, la Sra. Berríos fue secretaria de la Junta de Directores desde el 2019 hasta 2020.

18. Antes de la Sra. Berríos, y desde 2018, el Sr. David Ramos fue el presidente del Consejo.

19. Durante la presidencia del Sr. Ramos, el Consejo no tuvo administrador, sino que éste mismo se encargaba de cobrar las cuotas, gestionar contratos y demás funciones típicas de un administrador.

20. La Sra. Berríos pasó el Huracán María en su apartamento junto a su hijo, compañero y sus dos perritas. Observó la entrada de agua por receptáculos, por el baño, y por las ventanas.

21. La Sra. Berríos resumió los daños ocurridos en su apartamento en: daño a la mocheta de las ventanas, daño en los baños por humedad, y que se esponjó la puerta principal del apartamento.

22. La señora Berríos reparó los daños en su apartamento y, según describió, se encuentra en óptimas condiciones. Ésta no testificó sobre la fecha en que reparó la totalidad de su apartamento, ni si esto ocurrió antes o después de las inspecciones llevadas a cabo para propósitos de este litigio.

23. En cuanto al exterior del complejo, tras el paso del Huracán María, la Sra. Berríos observó árboles en el suelo, mucha agua en el área del estacionamiento y notó que la pintura estaba dañada.

24. La Sra. Berríos resumió los daños ocurridos en el exterior del Condominio en: grietas en muchos lugares, ventanas rotas, pintura dañada, empañetado dañado, losetas de la entrada de varias unidades desprendidas.

25. Las reparaciones efectuadas por el Consejo, con relación a los daños causados por el Huracán María, consisten en: trabajos en el estacionamiento, limpieza del gazebo y áreas comunes.

26. La Sra. Berríos advino en conocimiento de la reclamación del Consejo a MAPFRE por daños causados al Condominio por el Huracán María alrededor de marzo de 2019.

27. El Sr. Juan Alberto Méndez es el presidente y uno de los dueños de Total Claims International, LLC, compañía de ajustadores públicos. El Sr. Méndez es ajustador público desde inicios de la década de los 1990. Actualmente, labora en el estado de Florida.

28. Total Claims International fue incorporada el 2 de agosto de 2018.

29. Total Claims International brindó servicios de ajustador público al Consejo.

30. Como parte de estos servicios, Total Claims hace inspecciones a la propiedad, genera documentos para presentarlos a la aseguradora, lo cual incluye el estimado de daños.

31. Total Claims tiene un interés económico en el resultado de la reclamación del Consejo a MAPFRE, pues mientras más dinero reciba el Consejo, más se beneficia Total Claims International.

32. Total Claims preparó un estimado de daños causados por el Huracán María al Condominio, el cual remitió a MAPFRE en algún momento posterior al 11 de septiembre de 2018.

33. El estimado no ajustado de Total Claims ascendía a $17,186,034.65.

34. MAPFRE envió oferta al Consejo, por conducto de Total Claims, el 5 de noviembre de 2018. Dicha oferta incluía un estimado por $506,484.30 que, al restarse los deducibles aplicables, resultaba en un pago neto de $100,680.15. A la oferta se acompañó una tabla con el detalle de los daños reconocidos, resumen de los límites y deducibles de la póliza, así como una prueba de pérdida ("proof of loss") a ser firmado y juramentado por el Consejo, de aceptar la oferta.

35. Mediante carta del 25 de enero de 2019, Total Claims confirmó al Sr. Juan Cabán Collazo de MAPFRE el recibo de la oferta cursada. Además, hizo alusión a las diferencias entre la oferta y el estimado preparado por Total Claims, solicitó se aclarara si se realizaría un pago por la cuantía que llamó "indiscutida" ("undisputed"), e indagó sobre cómo se procedería para resolver las diferencias entre el estimado de Total Claims y la oferta de MAPFRE.

36. El Sr. Dort Rothafel es gerente de operaciones de campo para Forensic Building Science, Inc. ("FBS").

37. Como parte del proceso de inspección de FBS en el Condominio, el Sr. Dort Rothafel visitó, allá para el 2019, entre 6 o 7 apartamentos, algunos techos y áreas comunes. Como parte del proceso de inspección fue al Condominio 4 días.

38. El Sr. Dort Rothafel tiene acceso a las fotos y notas de campo que son parte de la inspección del Condominio en los archivos de FBS.

39. El Sr. Omar Acevedo Avilés trabaja como ajustador senior en el Departamento de Propiedad de MAPFRE.

40. Obtuvo un bachillerato en ingeniería civil del Recinto Universitario de Mayagüez de la Universidad de Puerto Rico en el 2010. Posee licencia de ingeniero en entrenamiento y de ajustador de seguros para riesgos comerciales, marítimo-terrestre y otras líneas.

41. Su experiencia laboral incluye haber trabajado en tasaciones de propiedades y en varios proyectos de construcción.

42. El Sr. Acevedo Avilés fue el encargado de revisar el ajuste de MAPFRE notificado al Consejo el 5 de noviembre de 2018.

43. Dicho ajuste fue preparado por el Lcdo. Mario Oronoz, en carácter de ajustador independiente.

44. MAPFRE no hizo un pago al Consejo por la cuantía del ajuste de 5 de noviembre de 2018.

45. El Sr. Acevedo Avilés entendió que, mediante la carta marcada como Exhibit 4 de la parte demandante, el Consejo rechazó la oferta realizada por MAPFRE el 5 de noviembre de 2018.

46. El Lcdo. Mario Oronoz Rodríguez obtuvo una licencia de ajustador, expedida por la Oficina del Comisionado de Seguros, algunos meses después del paso del Huracán María por Puerto Rico.

47. Como ajustador independiente, el Lcdo. Oronoz manejó sobre cincuenta reclamaciones comerciales presentadas por asegurados de MAPFRE, con relación a daños sufridos a causa del Huracán María.

48. Una parte sustancial de las reclamaciones manejadas por el Lcdo. Oronoz habían sido presentadas por consejos de titulares de condominios.

49. El Lcdo. Oronoz manejó la reclamación del Condominio Villas de Hato Tejas en carácter de ajustador independiente.

50. Como parte de sus funciones con respecto a la reclamación del Consejo, el Lcdo. Oronoz se

comunicaba con el Sr. Danny Massó, de la firma de ajustadores públicos Century Adjusting.

51. El 29 de enero de 2018, el Lcdo. Oronoz solicitó al Sr. Massó los estimados de daños que el Consejo estaba reclamando.

52. A esa fecha, el Consejo no había entregado estimados de sus daños a MAPFRE.

53. El 4 de junio de 2018, el Lcdo. Oronoz comunicó al Sr. Massó el itinerario de inspecciones de varias propiedades, lo cual incluía el Condominio Villas de Hato Tejas para los días 20 y 21 de junio de 2018.

54. El ajustador público, en este caso el Sr. Massó, era quien asignaba la prioridad de cada reclamación.

55. El 20 de junio de 2018, el Sr. Massó informó al Lcdo. Oronoz la cancelación de las inspecciones que se habían coordinado para comenzar en esa misma fecha.

56. Las inspecciones del Condominio Villas de Hato Tejas se recalendarizaron para los días 9 y 10 de julio de 2018.

57. Luego de que los inspectores contratados por MAPFRE inspeccionaran el Condominio, estos prepararon un estimado de daños en consulta con el Lcdo. Oronoz.

58. Como parte de este proceso, el Lcdo. Oronoz verificó las fotografías de la propiedad, y preparó una tabla de las distintas localidades incluidas en la póliza, así como cada edificio de la propiedad.

59. Posteriormente, dicho estimado se ajustó, a tenor con los términos y condiciones de la póliza expedida por MAPFRE al Consejo y se preparó la oferta que sería remitida al Consejo.

60. El 5 de noviembre de 2018, el Lcdo. Oronoz remitió la oferta de MAPFRE al Consejo, por conducto del Sr. Kirk Giménez, de Total Claims International.

61. El Lcdo. Oronoz nunca recibió respuesta del Sr. Giménez a su correo electrónico del 5 de noviembre de 2018.

62. Los peritos presentados por el Consejo fueron el Ing. Roberto López Esquerra y Thomas Irmiter.

63. Al presente, el Sr. Irmiter es el dueño y principal de FBS.

64. FBS fue contratado para evaluar el Condominio, determinar si ocurrió daño por causa del Huracán María y, de haber ocurrido, cuantificarlo.

65. FBS redactó el informe de causalidad y estimado de daños, los cuales sometió al Ing. Roberto López

Esquerra para su revisión y finalización del informe conjunto.

66. El estimado de daños de los peritos de la parte demandante fue preparado utilizando Xactimate, una plataforma de estimación de daños, orientada a reclamaciones de seguros.

67. FBS utilizó fotografías tomadas por Total Claims para estimar daños en apartamentos que FBS y Entech no inspeccionaron.

68. FBS también estimó daños en apartamentos del Condominio Villas de Hato Tejas que no fueron inspeccionados por FBS, Entech ni Total Claims.

69. El estimado original rendido por FBS y Entech para el Condominio Villas de Hato Tejas ascendía a alrededor de $14 millones. Al revisarlo, ese se redujo a alrededor de $8.8 millones.

70. Conforme al propio testimonio de los peritos de la parte demandante la reclamación inicial del Consejo estaba sobreestimada.

71. El estimado original de FBS y Entech incluía partidas para pruebas de magnómetro. Sin embargo, al reinspeccionar la propiedad en julio de 2020, los peritos del Consejo se percataron de que no existían los problemas eléctricos que harían necesarias dichas pruebas, por lo que eliminaron estas partidas en el estimado enmendado.

72. Al enmendar el estimado, FBS y Entech redujeron las partidas correspondientes a epoxy en concreto, remoción de losas, circuitos eléctricos, verjas, pavimento y jardinería (landscaping).

73. Durante las reinspecciones de julio de 2020, los peritos del Consejo se percataron que algunas de las grietas en las paredes no necesitaban epoxy, y se podían rellenar con empañetado. A esos efectos, redujeron dichas partidas.

74. En cuanto a la remoción de losetas, los peritos del Consejo eliminaron de su estimado parte de los trabajos relacionados a dicha tarea, pues concluyeron que no estaba relacionado con el paso del Huracán María y el movimiento del edificio.

75. Luego de que los abogados del Consejo informaran a los peritos que la póliza expedida por MAPFRE no incluía cubierta para requisitos de ordenanza o ley "ordinance or law", éstos removieron dichas partidas del estimado enmendado.

76. A pesar de que, durante las reinspecciones de julio de 2020 los peritos del Consejo inspeccionaron diez apartamentos que no habían sido previamente inspeccionados por estos, los estimados de dichos diez apartamentos no se enmendaron para reflejar los hallazgos de estas inspecciones.

77. Para determinar causalidad en cuanto a los daños al sistema de techado, uno de los aspectos a examinar es si el sistema existente se instaló correctamente. En el Condominio Villas de Hato Tejas, los sistemas de techado varían de un edificio a otro.

78. En los techos de los distintos edificios del Condominio los inspectores encontraron fregaderos, losas, pintura, y algunos se utilizaban como áreas de almacenamiento.

79. A pesar de que los peritos del Consejo no inspeccionaron alrededor de 30 apartamentos del Condominio, estos estimaron que era necesario reemplazar el 80% de las ventanas del edificio. Más aún, estimaron reparación de daños que serían causados por el reemplazo de las ventanas en el 100% de las habitaciones del 100% de los apartamentos.

80. El estimado de FBS y Entech no contiene una anotación por habitación en cada apartamento de las ventanas que deben ser reemplazadas. Por lo tanto, de mirar el estimado no se puede saber qué ventanas de qué habitación y de qué apartamento se están estimando para ser reemplazadas.

81. El Sr. Irmiter desconoce cuál fue el manufacturero de las ventanas del Condominio. Tampoco sabe con exactitud qué velocidad de viento recibió el Condominio. Por lo tanto, no puede saber a ciencia cierta si las ventanas se movieron más allá de la tolerancia de viento que están diseñadas para resistir.

82. Para aquellos apartamentos que ni los peritos del Consejo ni Total Claims inspeccionaron, el estimado de FBS y Entech incluye un estimado de 22 horas de "manipulación de contenido", lo cual el perito describió como mover los muebles del área donde se va a trabajar, y luego moverlos de regreso al culminar las labores. El Sr. Irmiter admitió que no sabe si estos apartamentos están desocupados. Por lo tanto, no se sabe qué tipo de contenido, si alguno, habría que "manipular". No empece lo anterior, FBS y Entech estimaron las partidas de manipulación de contenido en $37.50 por hora.

83. A pesar de que el Sr. Irmiter testificó que las reparaciones incluidas en el estimado de aquellos apartamentos no inspeccionados, y para los cuales los peritos no contaban con fotografías de Total Claims, estaban relacionadas únicamente a los daños que se causarían al interior por los trabajos de remoción y reemplazo de ventanas, el Sr. Irmiter admitió que además incluyeron partidas relacionadas a pintar los clósets de los dormitorios, los cuales no tienen ventanas.

84. Los peritos del Consejo utilizaron una metodología que llamaron "extrapolación", la cual consiste en estimar daños en áreas no inspeccionadas, utilizando los datos recopilados en áreas similares. Por ejemplo, el

Sr. Irmiter testificó que si inspeccionaban una unidad en el medio del segundo piso del edificio número 1, y sus ventanas estaban dañadas, es razonable pensar que las ventanas en los apartamentos de arriba, abajo, a la derecha y a la izquierda de ese apartamento también estarían dañadas.

85. El Sr. Irmiter testificó que no tiene conocimiento de que la metodología de extrapolación haya sido admitida por tribunales en Puerto Rico.

86. El Sr. Irmiter admitió que es posible que al usar la metodología de extrapolación se llegue a conclusiones incorrectas.

87. El Sr. Irmiter no ha visto fotografías de las condiciones del Condominio antes del Huracán María, ya que, a pesar de haberlas solicitado, el Consejo nunca se las proveyó.

88. El Sr. Irmiter admitió que el estimado de FBS incluye una partida para remover y volver a colocar el calentador de agua en trece apartamentos, a un costo de $640 cada uno. Éste desconoce si dicho costo es cónsono con el mercado de Puerto Rico, y testificó que se incluyó por ser el costo que provee Xactimate.

89. Xactimate no garantiza que los precios de las partidas y los servicios correspondan al valor del mercado para el cual se está estimando.

90. Xactimate sugiere al usuario que verifique o corrobore los precios del mercado, para tener más certeza de su corrección.

91. El Sr. Irmiter desconoce los precios del mercado en la industria de la construcción en Puerto Rico.

92. El Sr. Irmiter admitió que algunas de las fotos contenidas en el Exhibit 8 de la parte demandante muestran daños no relacionados con el Huracán María. Más aún, señaló que no hay forma del Tribunal poder determinar cuáles son las fotos que muestran daños no relacionados con el Huracán María.

93. El estimado de FBS y Entech contiene una partida de 120 horas, equivalentes a $7,758.40, para labores de remoción de agua. El Sr. Irmiter admitió que el Consejo no incurrió en gastos de remoción de agua, y que tampoco recibió evidencia de que los titulares hubiesen destinado 120 horas a dichas tareas.

94. El Sr. Irmiter testificó en varias ocasiones que las reparaciones propuestas en su estimado eran cónsonas con lo requerido por el Departamento de Vivienda en unas guías publicadas para la reconstrucción y reparación de viviendas públicas. Sin embargo, el propio perito admitió que las guías no son aplicables al Condominio Villas de Hato Tejas, por este no ser vivienda pública. Por tal razón, este Tribunal no tomará

en cuenta las referencias a guías del Departamento de Vivienda.

95. El Ing. Roberto López Esquerra fue el coautor del informe marcado como Exhibit 10 de la parte demandante, junto al Sr. Irmiter. Éste revisó el estimado preparado por el equipo de FBS.

96. El Ing. López entiende que los precios, métodos y medios incluidos en el estimado de FBS son correctos.

97. El Ing. López fue contratado como perito relacionado a daños por el paso de Huracán María por primera vez por la aseguradora Multinational. También hizo trabajos para Chubb.

98. La metodología utilizada por Entech en la inspección del Condominio Villas de Hato Tejas no fue la misma que dicha empresa utilizó al inspeccionar propiedades mientras realizó trabajos periciales para Multinational.

99. La metodología utilizada por Entech en dichas inspecciones tampoco fue la misma que utilizó cuando fue contratado por Chubb ni CAT Adjusters para los mismos propósitos.

100. Mientras el Ing. López realizaba trabajos periciales para Multinational, no incluía en su estimado daños a apartamentos si no podía entrar a ellos ni se podían percibir los daños desde el exterior.

101. Del informe narrativo y el estimado de FBS y Entech, no se puede identificar cuáles ventanas tienen un fallo en cohesión, ni la cantidad de ventanas que requieren reemplazo, ni la cantidad de ventanas que tienen cristales rotos, ni la cantidad de ventanas que tienen marcos rotos, ni la cantidad de ventanas que están desplazadas.

102. El estimado preparado por FBS y Entech contiene una partida para gerente de proyecto, a razón de $62.50 por hora trabajada, para un promedio de $1,800 semanales por solo 24 horas.

103. Confrontado con un informe pericial que rindió el Ing. López para el Condominio Plaza del Parque en octubre de 2020, relacionado con los daños sufridos por dicho edificio tras el paso del Huracán María, el Ing. López admitió que en dicha ocasión estimó la partida de gerente de proyecto a razón de $509.41 semanales, o $12.74 por hora.

104. El estimado preparado por FBS y Entech contiene una partida para un técnico de limpieza, a razón de $36.50 por hora trabajada, lo que equivale a $1,460 semanales en una semana de 40 horas.

105. Confrontado con un informe pericial que rindió el Ing. López para el Condominio Plaza del Parque en octubre de 2020, relacionado con los daños sufridos por

dicho edificio tras el paso del Huracán María, el Ing. López admitió que en dicha ocasión estimó la partida de técnico de limpieza a $260.00 por semana.

106. El Ing. López admitió que en Puerto Rico no se cotizan los precios de pintura de la manera en que los muestra Xactimate, es decir, incluyendo desglose de partidas por precios incidentales.

107. En Puerto Rico, un contratista de pintura considera todas las partidas que entienda necesarias, las suma, y provee una cotización por el total.

108. Por lo general, el contratista de pintura ya incluye en su cotización todo aquello relacionado a la limpieza final de su trabajo.

109. El Ing. López estuvo de acuerdo en que una inspección visual y táctil es más confiable que la metodología de extrapolación. No obstante, para un apartamento no inspeccionado, el 19102, reconoció que el informe por él suscrito reconoce una partida de $14,993.47 por los trabajos incidentales al cambio de ventanas, sin incluir el reemplazo de la ventana, costo que no está incluido en esa partida. Para ese mismo apartamento no inspeccionado, el Ing. López admite que su estimado considera una suma ascendente a aproximadamente $1,700.00 solo por las tareas relacionadas al pintar la sala. Dice que la tarea solo de pintura de ese apartamento, que mide entre 1,00 a 1,200 pies cuadrado, es de aproximadamente $7,500.00.

110. El ingeniero William Rosario Chárriez, de la firma ROV Engineering, fue contratado por MAPFRE como perito para evaluar y determinar los daños causados al Condominio Villas de Hato Tejas por el Huracán María y rendir un informe de los hallazgos.

111. El Ing. Rosario Chárriez posee un bachillerato en ingeniería eléctrica que obtuvo en la Universidad de Puerto Rico, Recinto Universitario de Mayagüez, en 1983.

112. El Ing. Rosario Chárriez tiene licencia vigente de ingeniero profesional expedida por el Departamento de Estado de Puerto Rico y es miembro del Colegio de Ingenieros de Puerto Rico.

113. El Ing. Rosario Chárriez trabajó por 32 años en la industria de las telecomunicaciones. Dentro de sus funciones para la Puerto Rico Telephone Company se desempeñó como ingeniero y gerente de proyectos en distintos departamentos. Allí, estuvo a cargo de, entre otras, coordinar construcción de tiendas, edificios, soterrado de cables e instalación de microondas.

114. Desde 2013, el Ing. Rosario Chárriez trabaja para Rely, Corp., como ingeniero y gerente de proyectos.

115. En dicha corporación, el Ing. Rosario Chárriez contrata proyectos, tales como remodelaciones de oficinas, baños, edificios, facilidades en hoteles y farmacéuticas, reparaciones en centros comerciales, trabajos eléctricos y de alarmas en bancos, entre otros, hace propuestas, y contrata empleados.

116. Luego del paso del Huracán María, el Ing. Rosario Chárriez trabajó en el inventario y estimado de daños para las facilidades de la compañía de telecomunicaciones AT&T, específicamente en cuanto a torres de microondas, instalaciones, postes y cableados.

117. Posteriormente, realizó trabajos similares para ICF. En dicha ocasión, realizó estimados de daños, métodos de reparación y costos de reparación a propiedades del gobierno, tales como escuelas y residenciales públicos.

118. Al presente, el Ing. Rosario Chárriez brinda servicios a ROV Engineering Services, PSC (ROV), una corporación de servicios de ingeniería. Como parte de sus servicios a ROV, éste ha realizado funciones periciales en alrededor de 30 condominios.

119. El Ing. Rosario Chárriez comenzó en ROV como inspector, y luego se le asignó la preparación de reportes periciales.

120. Como parte de su contratación por ROV, ha brindado servicios de inspección de condominios, así como preparación de informes periciales.

121. En la inspección del Condominio Villas de Hato Tejas por parte de ROV participaron alrededor de doce personas. Entre éstos, el Ingeniero Colón, quien fue el líder de grupo, otros cuatro o cinco ingenieros, un ajustador, y otros inspectores que no son ingenieros, pero tienen experiencia en la industria.

122. El líder de grupo decide qué inspectores entrarán a los apartamentos y qué inspectores permanecerán en las áreas exteriores.

123. El personal asignado por ROV inspeccionó 160 de los 192 apartamentos que componen el Condominio. En cuanto a los apartamentos no inspeccionados, el Ing. Chárriez testificó que se debió a que el dueño no estuvo disponible, rechazó la inspección, o informó que ya se habían realizado las reparaciones necesarias.

124. La metodología en las inspecciones en las que participó el Ing. Chárriez consistía básicamente en que se le daba al inspector una lista de los apartamentos y horas en que los inspeccionarían, llegaban a la residencia y procuraban por el titular o residente, se le preguntaba al residente si había estado en la propiedad durante el Huracán María y se le pedía que identificara los daños que entendía habían sido ocasionados por dicho fenómeno. Luego de esto, el inspector pasa a la propiedad a inspeccionar.

125. Una vez en el interior de cada apartamento, se inspecciona cada habitación, incluyendo: puertas, puertas corredizas del balcón, closets, paredes, grietas, pisos, ventanas, "caulking" y pintura. Los inspectores sacuden las ventanas y utilizan el operador.

126. Tanto en los apartamentos como en las áreas comunales exteriores, los inspectores toman fotografías de los daños, medidas y notas de campo. Cada inspector rellena una tabla de Excel con los datos recopilados en la visita, incluyendo áreas a reparar y estimado de costos de reparación. Toda esta información recopilada por los inspectores es cargada por el líder del grupo a un portal cibernético de ROV.

127. Luego, el Sr. Joan Fernández, contratista de ROV, toma el estimado completo de Excel y lo traslada a la plataforma Xactimate.

128. En cuanto a la pintura exterior del edificio, el informe pericial de ROV dispone para el repintado del 100% del área, lo cual equivale a 166,128 pies cuadrados.

129. Dicha tarea incluye, además, lavado a presión y aplicación de químico a 194,380 pies cuadrados de superficie exterior, reparación de 7,030 pies cuadrados de superficie exterior, y reparación de 1,908 pies cuadrados de lozas.

130. En cuanto a la casa club del Condominio, ROV estimó el lavado de 1,800 pies cuadrados, pintura de 5,900 pies cuadrados, y reparación de 5,900 pies cuadrados de superficie.

131. Para la estación de buzones, ROV estimó pintura de 504 pies cuadrados.

132. En cuanto a los portones eléctricos, ROV estimó pintura de 9,450 pies cuadrados, y reparación de 2,190 pies lineales.

133. En el área de la piscina, ROV estimó pintura de 140 pies cuadrados.

134. Para la caseta de seguridad, ROV estimó reparación de superficie y pintura de 700 pies cuadrados.

135. En cuanto a los techos, los inspectores encontraron áreas que requieren reparación, más ROV no recomienda el retechado total, como opinan los peritos del Consejo. La reparación recomendada por ROV comprende lavado a presión y la aplicación de algún agente químico para el hongo de la superficie, para luego aplicar el sellador elastomérico impermeabilizante. Este estimado no incluye aplicación de sellador en las áreas que no lo tenían antes del Huracán María.

136. El estimado de ROV incluye aplicar tratamiento elastomérico a 66,400 pies cuadrados de techo. Durante su testimonio directo, el Ing. Rosario Chárriez reconoció que existe un error en el estimado, ya que la partida escogida en Xactimate para el tratamiento de techo, erróneamente, fue la que corresponde a sellador elastomérico de techo de casas rodantes ("mobile homes"), el cual tiene un costo de $2.14 por pie cuadrado.

137. El Ing. Rosario Chárriez testificó que la partida correcta en Xactimate para dicha tarea debió haber sido "elastomeric roof coating for flat roof", la cual tiene un costo de $2.68 por pie cuadrado, es decir, $0.54 más por pie cuadrado que la incluida en el estimado de ROV. A esos efectos, el Ing. Rosario Chárriez enmendó su informe durante su testimonio, para reflejar un aumento de $35,856, resultantes de la multiplicación de $0.54 por 66,400 pies cuadrados de techado a reparar.

138. En cuanto a las ventanas, el Ing. Rosario Chárriez opina que, a diferencia de lo esbozado por los peritos del Consejo, no es necesario reemplazarlas todas. Testificó que no hay desplazamiento de las ventanas y los marcos, pues no observó dicha condición en las fotografías de las inspecciones. Sí observó que existe un descuadre en algunas ventanas, lo cual es típico de defectos de construcción.

139. El Ing. Rosario Chárriez opina que las ventanas con problemas menores no requieren ser reemplazadas y recomienda se realice cualquier arreglo mínimo que requieran las mismas.

140. El Ing. Rosario Charriez reconoció unas discrepancias en el estimado de ventanas entre el informe narrativo y el estimado de daños, lo que atribuyó en parte a que en ocasiones se alude a una ventana refiriéndose al boquete completo, que puede contener más de una ventana.

141. En cuanto a las losas despegadas, el Ing. Rosario Chárriez opina que éste es un problema que evidencia instalación deficiente, pues el agua acumulada no debe tener efecto alguno en las losas. Por tal razón, ROV solo incluyó en su estimado el reemplazo de aquellas lozas que el perito entendió pudieron haber sufrido daños relacionados con el Huracán, equivalentes al 2.5% de la superficie de pisos del edificio.

142. En el interior de los apartamentos, el Ing. Rosario Chárriez observó daños a partes de la pintura, superficies, gabinetes, losas ventanas y puertas.

143. El Ing. Rosario Chárriez no incluye en su informe estimado de daños para aquellos apartamentos que el equipo de ROV no pudo entrar para inspeccionar.

144. Para el Ing. Rosario Chárriez es importante lo que digan los residentes al momento de la inspección.

145. Sobre el apartamento 402 del edificio 3, el Ing. Rosario Chárriez testificó que éste fue inspeccionado por ROV, más no por FBS ni Entech. El total estimado por FBS y Entech para dicho apartamento fue $15,619.29. Por su parte, el estimado de ROV asciende a $6,971.89.

146. En cuanto al apartamento 101 del edificio 5, el cual tampoco fue inspeccionado por FBS ni Entech, pero sí por ROV, el estimado de los peritos del Consejo asciende a $15,391.55, mientras que el de ROV a $2,857.59.

147. Al igual que el Ing. López, el Ing. Rosario Chárriez declaró que un contratista en Puerto Rico no cotiza por separado las partidas incidentales a su trabajo, tales como recogido de basura, limpieza, mover los muebles, aplicar plástico protector, entre otras.

148. El estimado de daños preparado por ROV, contenido en el informe pericial suscrito por el Ing. Rosario Cárriez, asciende a $1,523,644.46. Al sumarle la cuantía adicional que procede por el error en la partida del sellado de techo, que asciende a $35,856.00, el estimado quedaría en un total de $1,559,500.46.

149. El Sr. Omar Acevedo Avilés testificó en un segundo turno, como testigo de MAPFRE.

150. El Sr. Acevedo Avilés fue el encargado de preparar el ajuste de la reclamación judicial del Consejo en este caso.

151. El Sr. Acevedo Avilés ha tomado cursos de propiedad comercial, así como de reclamaciones catastróficas en condominios.

152. El proceso que el Sr. Acevedo Avilés sigue para ajustar una reclamación envuelve lo siguiente:

> a. Mirar el riesgo que se esté reclamando esté identificado en la póliza;
> b. Corroborar que la póliza estuviese vigente al momento de la pérdida;
> c. Solicitar la información necesaria para llegar a una determinación;
> d. Aplicar los términos, condiciones y deducibles de la póliza;
> e. Emitir una determinación, ya sea con oferta de pago o cierre sin pago.

153. MAPFRE archiva los documentos relacionados a las reclamaciones en un archivo digital llamado WISE, el cual es custodiado por los ajustadores.

154. El expediente de la reclamación del Consejo en MAPFRE contiene los documentos de la reclamación extrajudicial, estimados, correos electrónicos, comunicaciones, carpetilla, avisos de accidente, acuse

de recibo, documentos legales, informes periciales y ajuste.

155. La Póliza expedida por MAPFRE al Consejo se compone de varias secciones.

156. La Hoja de Declaraciones de la Póliza describe el riesgo asegurado, incluyendo una descripción del inmueble y su localización. Además, provee el desglose de las cubiertas provistas para el riesgo asegurado y se describen las causas de pérdida cubiertas, incluyendo el límite y deducible.

157. La forma de la póliza titulada "Condominium Association Coverage Form" describe cómo es la cubierta de seguros del Condominio. La Sección A de esta forma dispone que la aseguradora pagará por pérdida o daño físico directo a la propiedad cubierta en los predios descritos en las declaraciones que haya resulte de una causa de pérdida cubierta. ("We will pay for direct physical loss of or damage to covered property at the premises described in the declarations caused by or resulting from any covered cause of loss.")

158. La sección 3 del "Condominium Association Coverage Form" dispone que las causas de pérdida cubiertas son aquellas detalladas en las declaraciones de la póliza. A su vez, las declaraciones indican que la causa de pérdida cubierta es "Special including theft".

159. El endoso titulado "Causes of Loss – Special Form" dispone que la póliza cubre todo daño físico directo a menos que se excluya o limite una causa específica por otro endoso.

160. La sección B de ese endoso contiene las exclusiones por las cuales no se activará la cubierta de propiedad.

161. Una de las exclusiones es la de daños causados por "wear and tear", es decir, desgaste o deterioro.

162. De forma similar, la sección 3.c.4 dispone que la aseguradora no pagará por daños ocasionados por mantenimiento inadecuado de la propiedad.

163. El inciso C del endoso contiene las limitaciones aplicables a la cubierta de propiedad contenida en la Póliza. El subinciso 1.c.1 dispone que la aseguradora no pagará por daños al interior del edificio causados por lluvia a menos que el edificio primero sufra una apertura a través de la cual la lluvia entre, por una causa cubierta.

164. El inciso 4 de esta sección, titulada "Loss Payment" dispone la forma en que la aseguradora indemnizará al asegurado. Estas son: (1) pagar el valor de la propiedad dañada; (2) pagar el costo de reparar o remplazar la propiedad dañada, sujeto a la condición que no incluye el costo adicional de cumplir con una ordenanza o ley; (3) tomar todo o cualquier parte de la propiedad a un valor acordado; o (4) reparar, reconstruir o remplazar la

propiedad con una propiedad de la misma clase, materiales y calidad.

165. Un asegurado que ya reparó un daño debe someter a la aseguradora la factura del proveedor, evidencia del pago, así como evidencia del daño, para que proceda el reembolso.

166. Para realizar el ajuste de la reclamación judicial del Consejo, el Sr. Acevedo Avilés primero recibió el estimado de daños contenido en el informe pericial preparado por ROV, y luego aplicó las condiciones, limitaciones y exclusiones de la Póliza, así como sus deducibles, de lo cual resultó una cuantía de pago neto.

167. El ajuste de la reclamación judicial contiene, a grandes rasgos, información de las distintas áreas del inmueble, los deducibles aplicables a cada cubierta, así como los costos contenidos en el estimado de ROV.

168. El Sr. Acevedo Avilés, al hacer el ejercicio del ajuste, elimina las partidas del estimado que corresponden a impuesto de negocio a negocio ("business to business" o "B2B") y condiciones generales ("general conditions") toda vez el Consejo de Titulares es un ente exento de pagar el impuesto de negocio a negocio.

169. Las condiciones generales son partidas asociadas a permisología, seguros, y otros costos asociados a la pérdida, pero no directamente relacionados a la misma.

170. La cuantía neta para pago contenida en el ajuste de la reclamación judicial ascendió a $928,553.39. Esto representa el total del estimado de ROV menos las condiciones generales, el impuesto de negocio a negocio y los deducibles.

171. Al sumarse la cuantía de $35,856.00, la cual resultó de la corrección del error contenido en la partida de sellado de techo del estimado de ROV, el ajuste de la reclamación judicial de MAPFRE asciende a $964,409.39.

172. Conforme a las disposiciones de la póliza, solo procede considerar aquellas áreas que requieren reparación o reemplazo por haber evidencia de que sufrieron daño directo, de manera que procede otorgar solo aquellas puertas y ventanas que se evidencie que en efecto sufrieron daños directo por el evento.

173. El informe pericial de la parte demandada detalla apartamento por apartamento cuántas ventanas y puertas contienen daños.

174. Una comparación entre narrativo y estimado de daños de la parte demandada demuestra que el narrativo identifica en algunos apartamentos más ventanas que requieren reparación lo que totalizan 46 ventanas2 a aproximadamente $136.31 por ventana para una cuantía adicional de $6,270.26.

175. El informe pericial de la parte demandante no contiene este detalle, por lo cual es imposible verificar qué puertas y ventanas de qué apartamentos sufrieron daños.

176. Además, el informe pericial de la parte demandante especula sobre los daños alegadamente sufridos en puertas y ventanas que no fueron inspeccionadas, lo cual carece de credibilidad.

177. El estimado de daños preparado por ROV, con las enmiendas aquí discutidas, reconocidas por su propio perito, es uno confiable y que se ajusta a los precios del mercado en Puerto Rico.

178. El estimado de daños preparado por FBS y Entech contiene partidas especulativas, por estar en áreas que no fueron inspeccionadas, además de partidas sobreestimadas y exageradas, y que no responden a la realidad del mercado en Puerto Rico.

179. El Sr. Irmiter, autor principal del estimado contenido en el informe pericial de la parte demandante, no tiene conocimiento de la industria de construcción en Puerto Rico, no tiene experiencia en dicha industria en Puerto Rico, así como tampoco demostró tener conocimiento sobre el costo de la mano de obra en esta jurisdicción.

180. A pesar de que el Ing. López Esquerra, también perito de la parte demandante, sí tiene experiencia en la industria de la construcción en Puerto Rico, éste admitió seguir metodologías distintas en este caso y en los que trabajó cuando brindó servicios a la aseguradora Multinational. También admitió que a los empleados de la construcción en Puerto Rico se les paga sustancialmente menos que lo que incluye su estimado para dichas partidas.

181. El Ing. López Esquerra también admitió que los trabajos de pintura en Puerto Rico no se cotizan de forma segmentada, tal como lo produce Xactimate.

182. Así pues, el estimado de la parte demandante no responde a la realidad de lo que tendrá que incurrir el Consejo de Titulares para reparar los daños causados por el Huracán María.

183. Los peritos de la parte demandante estimaron el costo para una firma de arquitectura e ingeniería en $584,654.84, lo que representa un 8% del total del proyecto según estimado por ellos. Sin embargo, ninguno de los peritos estableció de manera alguna por qué razón sería necesario para el Consejo incurrir en este costo.

184. El informe pericial de la parte demandante estima el reemplazo de la mayoría o todas las ventanas de los apartamentos sin que los peritos o su equipo inspeccionaran todos los apartamentos y, por lo tanto,

pudieran acreditar la existencia de algún daño. La metodología de extrapolación utilizada por los peritos de la parte demandante no nos mereció credibilidad.

185. Por tal razón, no quedó establecido daño alguno en aquellos apartamentos que no fueron inspeccionados por los peritos.

186. No todo daño a una ventana hace necesario su reemplazo. Las ventanas son susceptibles de ser reparadas, en casos donde, por ejemplo, solo se requiere remover y reaplicar el sellador ("caulking"), reemplazar los operadores, o ajustar algún elemento de la unidad.

187. El programa Xactimate no garantiza la corrección de los precios suplidos. Además, recomienda que el usuario corrobore la corrección de los precios con el mercado local.

188. Al tomar en cuenta las inconsistencias en la metodología seguida por el Ing. López Esquerra en este caso y la seguida en otros casos, así como las discrepancias entre lo que éste acepta son los costos de mano de obra del mercado y lo que estimó en el informe para este caso, el desconocimiento del Sr. Irmiter sobre la industria de la construcción en Puerto Rico, así como la cantidad de partidas contenidas en dicho informe que no se sustentan con evidencia alguna, y/o que son exageradas y sobrevaloradas, a este Tribunal no le merece credibilidad dicho informe ni el testimonio pericial de los señores López Esquerra e Irmiter, frente a la prueba pericial de la parte demandada.

El foro primario concluyó que MAPFRE actuó de manera diligente y no incumplió con sus obligaciones contractuales. Razonó que la parte demandante no presentó prueba del alegado incumplimiento por parte de MAPFRE, si no que recibió prueba que se limitaba a la discrepancia en torno al valor total de los daños. De igual forma, le pareció más razonable el estimado preparado por el perito de MAPFRE, por lo que concluyó que los daños causados por el huracán María al Condominio Villas de Hato Tejas, cubiertos por la Póliza expedida por MAPFRE, ascendían a novecientos setenta mil con seiscientos setenta y nueve dólares ($970, 679.00). Debido a que MAPFRE le había satisfecho al Consejo de Titulares la suma de cien mil seiscientos ochenta dólares ($100,680.00), ordenó el pago de ochocientos sesenta y nueve mil novecientos noventa y nueve

dólares con setenta centavos ($869,999.70) en cumplimiento de los términos y condiciones de la póliza.

En desacuerdo, el Consejo de Titulares presentó una *Moción de Reconsideración y Solicitud de Determinaciones de Hechos y Derecho Adicionales* el 7 de agosto de 2023.[109] El 8 de agosto de 2023 el Tribunal de Primera Instancia emitió una Resolución en la cual declaró **No Ha Lugar** al aludido escrito.[110]

Aún inconforme, el 7 de septiembre de 2023, la parte apelante acude mediante el presente recurso de Apelación Civil y nos señala la comisión de los siguientes errores:

> **PRIMER ERROR: ERRÓ EL TPI AL DECLARAR "NO HA LUGAR" LA *DEMANDA*, PORQUE LA EVIDENCIA DESFILADA EN EL JUICIO DEMOSTRÓ QUE MAPFRE INCUMPLIÓ CON SUS OBLIGACIONES SEGÚN LA PÓLIZA DE SEGUROS Y QUE EL CONSEJO DE TITULARES ERA ACREEDOR DE UN REMEDIO.**
>
> **SEGUNDO ERROR: ERRÓ EL TPI COMO CUESTIÓN DE DERECHO AL DECLARAR "NO HA LUGAR" LA *DEMANDA*, PUES AL ASÍ HACERLO LE IMPUSO UN ESTANDAR DE PRUEBA ERRADO AL CONSEJO DE TITULARES PARA PROBAR SUS CAUSAS DE ACCIÓN Y DAÑOS.**
>
> **TERCER ERROR: ERRÓ EL TPI EN SU APRECIACIÓN DE LA PRUEBA, Y AL EMITIR DETERMINACIONES DE HECHOS Y DERECHO QUE NO SE CONFORMAN A LA PRUEBA DESFILADA EN JUICIO Y O SEGÚN LE FUERA SOLICITADO Y DEMOSTRADO CON HECHOS ESPECÍFICOS EN LA *MOCIÓN DE RECONSIDERACÍON*.**
>
> **CUARTO ERROR: ERRÓ EL TPI COMO CUESTIÓN DE DERECHO EN SUS DETERMINACIONES Y CONCLUSIONES EN TORNO A LA PRUEBA PERICIAL Y LA VALORIZACIÓN DE LOS DAÑOS.**
>
> **QUINTO ERROR: ERRÓ EL TPI AL TOMAR "CONOCIMIENTO JUIDICIAL" DE LA SENTENCIA DEL 18 DE OCTUBRE DE 2022 EN EL CASO *CONSEJO DE TITULARES DEL CONDOMINIO BAHÍA DEL MAR V. MAPFRE PRAICO INSURANCE COMPANY*, CIVIL NÚM. AU2019CV00515.**
>
> **SEXTO ERROR: ERRÓ EL TPI AL CONCLUIR QUE EL AJUSTE DE MAPFRE FUE ADECUADO Y ADMITIRLO EN EVIDENCIA, CUANDO MAPFRE NUNCA**

---

[109] Apéndice del Recurso de *Apelación Civil*, págs. 783-1395.
[110] Apéndice del Recurso de *Apelación Civil*, págs. 1396-1416. Notificada y archivada en autos el 8 de agosto de 2023.

**PRESENTÓ UN PERITO EN TORNO AL AJUSTE Y LA EVIDENCIA DEMOSTRÓ QUE EL AJUSTE INCUMPLIÓ CON EL CÓDIGO DE SEGUROS.**

**SEPTIMO ERROR: ERRÓ EL TPI AL NO OTORGAR UNA SUMA RAZONABLE DE HONORARIOS DE ABOGADOS A FAVOR DEL CONSEJO DE TITULARES.**

El 13 de marzo de 2024, la parte apelada presentó su *Alegato en Oposición.*

Contando con la comparecencia de ambas partes, procedemos a resolver.

**II**

**A**

Sabido es que los Tribunales apelativos actuamos esencialmente como foros revisores, por lo que nuestra tarea principal es examinar como los tribunales inferiores aplican el derecho a los hechos particulares de cada caso. *Dávila Méndez v. Meléndez Marín*, 187 DPR 750, 770 (2013). Por eso, para poder ejercer nuestra función revisora, requiere que los tribunales de instancia hayan perfeccionado un expediente completo que incluya los hechos que hayan determinado ciertos a la luz de la prueba presentada. *Íd.*

Es norma reiterada en nuestro ordenamiento jurídico, que los foros apelativos debemos brindar deferencia a las determinaciones de hechos formuladas por los tribunales de instancia. *Serrano Muñoz v. Auxilio Mutuo,* 171 DPR 717, 741 (2007). Esto es así pues los Tribunales apelativos no celebramos juicios plenarios, no presenciamos el testimonio oral de los testigos, ni dirimimos su credibilidad y no realizamos determinaciones de hechos, por ser una función de los foros sentenciadores. *Dávila Méndez v. Meléndez Marín*, supra. pág. 770. Por esta razón, si no media error manifiesto, pasión, prejuicio o parcialidad y, por consiguiente, abuso de discreción los Tribunales apelativos no intervendremos con "las

determinaciones de hechos ni con la adjudicación de credibilidad que haya efectuado el juzgador de los hechos". *Mena Pamias v. Jímenez Melendez,* 212 DPR 758, 774 (2023); *Serrano Muñoz v. Auxilio Mutuo,* supra.

No pese a la norma de deferencia, nuestro ordenamiento jurídico ha establecido que cuando las conclusiones de hecho realizadas por el foro de instancia estén basadas en prueba pericial o documental, los foros apelativos nos encontraremos en la misma posición que el Tribunal sentenciador, dándonos el poder de adoptar nuestro propio criterio en la apreciación y evaluación de la prueba pericial, y hasta para descartarla, aunque resulte técnicamente correcta. *González Hernández v. González Hernández*, 181 DPR 746, 777 (2011).

**B**

La Regla 110 de Evidencia de Puerto Rico, 32 LPRA Ap. VI, establece que el juzgador o juzgadora de los hechos debe evaluar la evidencia que se le ha sido presentada con el principal propósito de determinar cuáles hechos han sido demostrados o establecidos a la luz de los siguientes principios:

> (a) El peso de la prueba recae sobre la parte que resultaría vencida de no presentarse evidencia por alguna de las partes.
>
> (b) La obligación de presentar evidencia primeramente recae sobre la parte que sostiene la afirmativa en el asunto en controversia.
>
> (c) Para establecer un hecho, no se exige aquel grado de prueba que, excluyendo posibilidad de error, produzca absoluta certeza.
>
> […]
>
> (e) La juzgadora o el juzgador de hechos no tiene la obligación de decidir de acuerdo con las declaraciones de cualquier cantidad de testigos que no le convenzan contra un número menor u otra evidencia que le resulte más convincente.
>
> (f) **En los casos civiles, la decisión de la juzgadora o del juzgador se hará mediante la preponderancia de la prueba a base de criterios de probabilidad, a**

**menos que exista disposición al contrario.** En los casos criminales, la culpabilidad de la persona acusada debe ser establecida más allá de duda razonable.

[...]

(h) Cualquier hecho en controversia es susceptible de ser demostrado mediante evidencia directa o mediante evidencia indirecta o circunstancial. Evidencia directa es aquélla que prueba el hecho en controversia sin que medie inferencia o presunción alguna y que, de ser cierta, demuestra el hecho de modo concluyente. Evidencia indirecta o circunstancial es aquélla que tiende a demostrar el hecho en controversia probando otro distinto, del cual por si o, en unión a otros hechos ya establecidos, puede razonablemente inferirse el hecho en controversia. (Énfasis suplido)

**C**

Las obligaciones nacen de la ley, los contratos, los cuasicontratos, los actos y omisiones ilícitos o en los que se actúe mediando culpa o negligencia. Artículo 1042 del Código Civil de 1930, 31 LPRA sec. 2992, vigente cuando ocurrieron los hechos. El Artículo 1206 del Código Civil de 1930, 31 LPRA sec. 3371, establece que un contrato existe desde que una o varias personas prestan su consentimiento para obligarse entre ellas a prestar un servicio o brindar una cosa. Aquellas obligaciones que nacen a raíz de un contrato se consideran ley entre las partes, por lo que deben cumplirse a tenor de este. Artículo 1044 del Código Civil de 1930, 31 LPRA sec. 2994. Los contratos quedan perfeccionados desde el mero consentimiento "y desde entonces obligan, no sólo al cumplimiento de lo expresamente pactado, sino también a todas las consecuencias que según su naturaleza sean conformes a la buena fe, al uso y a la ley". Artículo 1210 del Código Civil de 1930, 31 LPRA sec. 3375.

Para que exista un contrato deben concurrir tres (3) elementos, estos son: (a) el consentimiento de los contratantes; (b) el objeto cierto que sea materia el contrato y (c) la causa de la obligación que se establezca. Artículo 1213 del Código Civil de 1930, 31 LPRA sec. 3391. Por su parte, el consentimiento "se manifiesta

por el concurso de la oferta y de la aceptación sobre la cosa y la causa que han de constituir el contrato". Artículo 1214 del Código Civil de 1930, 31 LPRA sec. 3401. El consentimiento será nulo cuando es prestado mediante error, violencia, intimidación o dolo. Artículo 1217 del Código Civil de 1930, 31 LPRA sec. 3404. El dolo ocurre cuando mediante palabras o maquinaciones insidiosas de parte de uno de los contratantes, se induce a otro contratante a realizar un negocio jurídico que sin estas palabras o maquinaciones no se hubiese celebrado. Artículo 1221 del Código Civil de 1930, 31 LPRA sec. 3409.

Quienes en el cumplimiento de sus obligaciones incurran en dolo, negligencia o morosidad quedaran sujetos a la indemnización de los daños y perjuicios causados por esta. Artículo 1054 del Código Civil de 1930, 31 LPRA sec. 3018. Las acciones *ex contractu* están fundamentadas en el incumplimiento de un deber que surge de la voluntad previa pactada entre las partes, por lo que su finalidad es que se cumplan aquellas promesas por los cuales las partes prestaron su consentimiento. *Muñiz-Oliviari v. Steifel Labs.*, 174 DPR 813, 818 (2008) (citas omitidas). El Tribunal Supremo, mientras discute las diferencias entre las acciones extracontractuales y las *ex contractu* expresó lo siguiente:

> A pesar de esta diferenciación entre la acción de daños extracontractual y la *ex contractu,* ambas comparten sus elementos esenciales. Al igual que en la acción extracontractual, **en la *ex contractu* la parte promovente debe probar la existencia de los daños alegados y del incumplimiento culposo o doloso de la obligación contractual. Además, debe existir una relación de causa a efecto entre el incumplimiento y los daños sobrevenidos**. *Íd.* pág. 819. (Énfasis suplido).

**D**

En nuestro ordenamiento jurídico, los negocios de seguros están revestidos con el más alto interés público debido a su importancia, complejidad y su efecto tanto en la economía como en

la sociedad. *Consejo de Titulares v. MAPFRE*, 208 DPR 761, 773 (2022). Esto es así pues el desenvolvimiento de la economía del país depende de los contratos de seguros y su buen funcionamiento. *Íd.*

Esta industria está regulada mediante la Ley Núm. 77 de 19 de junio de 1957, conocida como *Código de Seguros de Puerto Rico,* 26 LPRA se. 101, según enmendada. Mediante el contrato de seguro, las personas naturales y jurídicas pueden proteger sus bienes y obligaciones mediante el traspaso del impacto económico de aquellos riesgos o pérdidas acordadas con la aseguradora a cambio del pago de una prima. *Consejo de Titulares v. MAPFRE,* supra. El Tribunal Supremo ha expresado que esta relación jurídica entre el asegurado y la aseguradora se da en el marco de un deber de actuar de buena fe, por lo que en un contrato de seguro queda implícito el pacto de buena fe y la aseguradora se encuentra en la obligación de actuar "con especial consideración por los intereses del asegurado". *Íd.* pág. 774 citando a *Quiñones López v. Manzano Pozas*, 141 DPR 139, 174 (1996); *Morales v. Automatic Vending Service, Inc.*, 103 DPR 281 (1975).

En el ámbito de las prácticas desleales en el ajuste de reclamaciones el Artículo 27.161 del Código de Seguros de Puerto Rico, 26 LPRA sec. 2716ª, prohíbe que ninguna persona puede incurrir o llevar a cabo las siguientes prácticas:

> […]
>
> (2) Dejar de acusar recibo y no actuar con razonable diligencia dentro de los noventa (90) días, luego de radicada y notificada una reclamación bajo los términos de una póliza.
>
> (3) Dejar de adoptar e implementar métodos razonables para la rápida investigación de las reclamaciones que surjan bajo los términos de una póliza.
>
> (4) Rehusar pagar una reclamación sin llevar a cabo una investigación razonable basada en la información disponible.

(5) Rehusar confirmar o denegar cubierta de una reclamación dentro de un término razonable luego de haberse completado la declaración de pérdida.

(6) No intentar de buena fe de llevar a cabo un ajuste rápido, justo y equitativo de una reclamación de la cual surja claramente la responsabilidad.

(7) Obligar a los asegurados o reclamantes a entablar pleitos para recobrar bajo los términos de una póliza, porque se le ha ofrecido al asegurado o reclamante una cantidad sustancialmente menor que la cantidad que podría ser recobrada finalmente en un litigio o porque se le ha negado incorrectamente la cubierta bajo los términos de la póliza.

(8) Tratar de transigir una reclamación por una cantidad menor que la que el asegurado o reclamante razonablemente tenga derecho, basado en la literatura o material impreso que se le acompañó o se hizo formar parte de la solicitud.

[...]

En Artículo 27.162 del *Código de Seguros de Puerto Rico*, 26 LPRA sec. 2716b, establece los términos que tienen los aseguradores para resolver las reclamaciones, en específico versa de la siguiente manera:

(1) La investigación, ajuste y resolución de cualquier reclamación se hará en el período razonablemente más corto dentro de noventa (90) días después de haberse sometido al asegurador la reclamación.

(2) En el caso de que un asegurador no pueda resolver una reclamación en el término establecido en el inciso (1) de este Artículo, deberá mantener en sus expedientes los documentos que acrediten la existencia de justa causa para exceder el término anteriormente dispuesto.

(3) El Comisionado en cualquier momento podrá ordenar la resolución inmediata de cualquier reclamación si considera que se está dilatando o retrasando indebida e injustificadamente la resolución de la misma.

En el año 2012, la Oficina del Comisionado de Seguros emitió una *Carta Normativa Núm. 2012- 145 D* en la cual se expresa sobre lo que es considerado como *justa causa* a la luz del Artículo 27.162, en específico expresó:

[...]

(b) Reclamaciones altamente complejas- Siniestros catastróficos, pérdidas cuantiosas o numerosas, o reclamaciones donde sea necesaria la contratación de peritos especializados, y en los que cerrar la reclamación sería un perjuicio del asegurado o reclamante. En estos casos, el expediente de la reclamación deberá documentarse periódicamente sobre el adelanto hacia la resolución de la misma, así como un estimado de tiempo necesario para resolver.

[...]

La póliza es aquel instrumento en donde se expresa el contrato de seguro y sus términos. Artículo 11.140 del *Código de Seguros de Puerto Rico*, 26 LPRA sec. 1114; *Rivera Matos et al. v. Triple-S et al.*, 204 DPR 1010, 1020. Al evaluarse las protecciones brindadas por una póliza, es necesario además examinar sus exclusiones, que, por lo general, se interpretan restrictivamente en contra del asegurador bridando una mayor protección al asegurado. *Rivera Matos et al. v. Triple-S et al.*, supra, pág. 1021. No pese a lo anterior, el Tribunal Supremo ha expresado que, si los términos de exclusión son claros y son de aplicación, la aseguradora no será responsable de aquellos riesgos expresamente exceptuados. Íd. citando a *Viruet et al. v. SLG Casiano- Reyes,* 194 DPR 271, 279 (2015).

Respecto a los litigios de seguros, nuestro más alto foro ha expresado que corresponde al asegurado el peso de establecer que su reclamación está incluida dentro de las disposiciones del contrato de seguro. *Rivera Matos et al. v. Triple-S et al.*, supra, pág. 1022. Por su parte, corresponde a la aseguradora evidenciar que aplica alguna exclusión. *Íd.*

**E**

El perito es aquella persona que ha desarrollado un conocimiento o destreza a través de la educación o experiencia sobre una determinada materia de tal manera que pudiera realizar una opinión que sirva de asistencia al juzgador o juzgadora de los hechos. *S.L.G. Font Bardón v. Mini-Warehouse,* 179 DPR 322, 338

(2010) citando a *Black's Law Dictionary*, 8va ed., Minnesota, Ed. Thomson West, 2004, pág. 619.

Como norma general, la Regla 701, de Evidencia de Puerto Rico, 32 LPRA Ap. VI, establece que cuando una persona que no esté testificando como perito, su declaración en forma de opinión o inferencia será limitada a:

> (a) estén racionalmente fundadas en la percepción de la persona testigo,
> (b) sean de ayuda para una mejor comprensión de su declaración o para la determinación de un hecho en controversia,
> y (c) no estén basadas en conocimiento científico, técnico o cualquier otro conocimiento especializado dentro del ámbito de la Regla 702.

La Regla 702 de Evidencia de Puerto Rico, supra, establece que cuando el conocimiento científico, técnico o especializado le puede ser de asistencia a un juzgador o juzgadora de hechos, para poder entender la prueba presentada o determinar un hecho en controversia, una persona testigo que ha sido capacitada como perito podrá testificar en forma de opiniones o de otra manera. Por su lado, la Regla 703 de Evidencia de Puerto Rico, supra, regula lo relacionado a la capacitación de una persona testigo como perito, en específico, establece lo siguiente:

> (a) Toda persona está calificada para declarar como testigo pericial si posee especial conocimiento, destreza, experiencia, adiestramiento o instrucción suficiente para calificarla como experta o perita en el asunto sobre el cual habrá de prestar testimonio. Si hubiere objeción de parte, dicho especial conocimiento, destreza, adiestramiento o instrucción deberá ser probado antes de que la persona testigo pueda declarar como perita.
>
> (b) El especial conocimiento, destreza, experiencia, adiestramiento o instrucción de una persona que es testigo pericial podrá ser probado por cualquier evidencia admisible, incluyendo su propio testimonio.
>
> (c) La estipulación sobre la calificación de una persona perita no es impedimento para que las partes puedan presentar prueba sobre el valor probatorio del testimonio pericial.

El valor que se le puede dar al testimonio pericial brindado por la persona perito está regulado por la Regla 702 de Evidencia de Puerto Rico, supra, el cual dependerá, entre otras cosas, de:

(a) Si el testimonio está basado en hechos o información suficiente;

(b) si el testimonio es el producto de principios y métodos confiables;

(c) si la persona testigo aplicó los principios y métodos de manera confiable a los hechos del caso;

(d) si el principio subyacente al testimonio ha sido aceptado generalmente en la comunidad científica;

(e) las calificaciones o credenciales de la persona testigo,

y (f) la parcialidad de la persona testigo.

La admisibilidad del testimonio vertido por la persona perita será determinada por el tribunal de conformidad con los factores enumerados en la Regla 403 de Evidencia de Puerto Rico, supra, es decir:

Evidencia pertinente puede ser excluida cuando su valor probatorio queda sustancialmente superado por cualesquiera de estos factores:

(a) Riesgo de causar perjuicio indebido.

(b) Riesgo de causar confusión.

(c) Riesgo de causar desorientación del jurado.

(d) Dilación indebida de los procedimientos.

(e) Innecesaria presentación de prueba acumulativa.

El juzgador o juzgadora de los hechos tiene amplia discreción en relación con la aceptación o exclusión de la prueba pericial presentada. *S.L.G. Font Bardón v. Mini-Warehouse,* 179 DPR 322, 343 (2010). Incluso, en nuestro ordenamiento jurídico es norma reiterada que el juzgador o juzgadora de los hechos no está obligado a aceptar las conclusiones hechas por un perito, por lo que, si luego de evaluar el testimonio pericial llega a la conclusión de que no merece credibilidad puede rechazarlo. *Íd.* pág. 346 citando a *Pueblo v. Montes Vega,* 118 DPR 164, 170–171 (1986), citando a *Pueblo v.*

*Marcano Pérez,* 116 DPR 917, 928 (1986); *Velázquez v. Ponce*

*Asphalt,* 113 DPR 39, 48 (1982); *Pueblo v. Dones,* 56 DPR 211, 222

(1940).

Sobre la cualificación de la persona perita bajo la Regla 703

de Evidencia de Puerto Rico, *supra,* el tratadista Rolando

Emmanuelli Jiménez ha expresado que:

> No es necesario cualificar a la persona como perita antes de recibir su testimonio. La Regla establece que el conocimiento, destreza o experiencia que cualifica al perito deberá ser probado antes de que declare, sólo si existe objeción de parte. Para establecer las credenciales del o la perita se puede presentar cualquier tipo de evidencia incluyendo el testimonio del propio perito. Lo más común es que el o la perita sea interrogada sobre sus cualificaciones antes de que comience a declarar, pero la Regla permite que se entre en la materia o sustancia del testimonio sin determinarse primero las cualificaciones. Esta norma persigue la economía procesal y la rapidez en la presentación de la prueba. Solamente habrá que entrar en ese extremo si la parte contraria objeta las cualificaciones del o la perita.[111]

Existen ocasiones en las cuales una persona perita a su vez

es testigo, el Tribunal Supremo ha expresado que esta condición se

configura cuando:

> …concurren las circunstancias fortuitas de un perito que presencia o participa en un hecho que subsiguientemente es total o parcialmente objeto de una contienda judicial. Nos 'hallamos [ante] una doble actividad probatoria de una misma persona: actividad testifical y actividad pericial. Una misma persona actúa como testigo y perito, a través del procedimiento de la prueba de testigos.[112]

A raíz de lo anterior nuestro más alto foro ha reconocido tres (3)

tipos de peritos, estos son: (1) perito de ocurrencia, (2) perito en

general y (3) peritos intermedios. *San Lorenzo Trad., Inc. v.*

*Hernández,* 114 DPR 704, 718 (1983). Referente a los peritos de

ocurrencia, estos son aquellos que han tenido una percepción

inmediata de los hechos lo cual es considerada información

---

[111] R. Emmanuelli Jiménez, *Prontuario de Derecho Probatorio Puertorriqueño,* 4ta ed. rev., Ed. Situm, 2015, pág. 439.
[112] *San Lorenzo Trad., Inc. v. Hernández,* 114 DPR 704, 713 (1983) (citas omitidas).

irremplazable. Es decir, estos peritos han adquirido información de manera extrajudicial mediante observaciones directas o participaciones subsiguientes que son de pertinencia en el litigio. *Íd.*

**F**

El conocimiento judicial es un medio de prueba que pretende establecer un hecho como cierto sin la necesidad de presentar evidencia. *U.P.R. v. Laborde Torres y otros I,* 180 DPR 253, 276 (2010) citando a E.L. Chiesa, *Tratado de derecho probatorio: reglas de evidencia de Puerto Rico y federales,* [ed. de autor], 1998, T. II, Sec. 13.1, pág. 1129. Por lo que, si un tribunal toma conocimiento judicial de un hecho adjudicativo, significa que ese hecho es aceptado como si fuese cierto, sin que la persona que lo ofrece presente prueba de su veracidad y se presumirá que la cuestión es tan notoria que no está en disputa. *Íd.* pág. 277. Independientemente de lo establecido, esto no impide que la parte contraria ofrezca prueba en contrario. *Íd.* (citas omitidas).

La Regla 201 de Evidencia de Puerto Rico, supra, establece en lo pertinente:

> (a) Esta regla aplica solamente al conocimiento judicial de hechos adjudicativos.
>
> (b) El tribunal podrá tomar conocimiento judicial solamente de aquel hecho adjudicativo que no esté sujeto a controversia razonable porque:
>
>> (1) Es de conocimiento general dentro de la jurisdicción territorial del tribunal, o
>>
>> (2) es susceptible de corroboración inmediata y exacta mediante fuentes cuya exactitud no puede ser razonablemente cuestionada.
>
> (c) El tribunal podrá tomar conocimiento judicial a iniciativa propia o a solicitud de parte. Si es a solicitud de parte y ésta provee información suficiente para ello, el tribunal tomará conocimiento judicial.
>
> (d) Las partes tendrán derecho a ser oídas en torno a si procede tomar conocimiento judicial. De no haber sido notificada oportunamente por el tribunal o por la parte promovente, la parte afectada podrá solicitar la oportunidad de ser oída luego de que se haya tomado conocimiento judicial.

(e) El tribunal podrá tomar conocimiento judicial en cualquier etapa de los procedimientos, incluyendo la apelativa.

(f) En casos criminales ante jurado, la jueza o el juez instruirá a las personas miembros del jurado que pueden, pero no están obligados a aceptar como concluyente cualquier hecho del cual haya sido tomado conocimiento judicial.

El Tribunal Supremo ha expresado que bajo las disposiciones de esta regla los foros sentenciadores pueden tomar conocimiento judicial de "los procedimientos celebrados y de la sentencia o resolución dictada" sobre cualquier causa seguida en el mismo tribunal o en otro tribunal dentro de la jurisdicción de este. *Asoc. de Periodistas v. González,* 127 DPR 704, 714-715. Esto es así pues al "tratarse de hechos cuya comprobación o determinación puede efectuarse de forma exacta e inmediata (sólo hay que acudir a la secretaría del tribunal en cuestión), es innecesario exigir en estos casos que se presente evidencia formal de los mismos". *Íd.*

### G

El desistimiento consiste en que una de las partes en el pleito o todas desisten de tramitar la acción ante un tribunal. R. Hernández Colón, *Práctica Jurídica de Puerto Rico Derecho Procesal Civil*, 6ta ed. rev., Ed. LexisNexis, pág. 414. La Regla 39.1 de Procedimiento Civil, 32 LPRA Ap. V, regula el desistimiento en los pleitos civiles, en lo pertinente establece lo siguiente:

(a) Por el demandante; por estipulación. Sujeto a las disposiciones de la Regla 20.5, una parte demandante podrá desistir de un pleito sin una orden del tribunal:

(1) mediante la presentación de un aviso de desistimiento en cualquier fecha antes de la notificación por la parte adversa de la contestación o de una moción de sentencia sumaria, cualesquiera de éstas que se notifique primero,

o (2) mediante la presentación de una estipulación de desistimiento firmada por todas las partes que hayan comparecido en el pleito. A menos que el aviso de desistimiento o la estipulación exponga lo contrario, el desistimiento será sin perjuicio, excepto que el aviso de desistimiento tendrá el efecto de una

adjudicación sobre los méritos cuando lo presente un demandante que haya desistido anteriormente en el Tribunal General de Justicia, o en algún tribunal federal o de cualquier estado de Estados Unidos de América, de otro pleito basado en o que incluya la misma reclamación.

(b) Por orden del tribunal. A excepción de lo dispuesto en el inciso (a) de esta regla, no se permitirá al demandante desistir de ningún pleito, excepto mediante una orden del tribunal y bajo los términos y las condiciones que éste estime procedentes. A menos que la orden especifique lo contrario, un desistimiento bajo este párrafo será sin perjuicio.

**H**

La Regla 44.1 de Procedimiento Civil de Puerto Rico, supra, en su inciso (d) regula lo relacionado a honorarios de abogados. En lo pertinente establece:

(d) Honorarios de abogado. En caso de que cualquier parte o su abogado o abogada haya procedido con temeridad o frivolidad, el tribunal deberá imponerle en su sentencia al o a la responsable el pago de una suma por concepto de honorarios de abogado que el tribunal entienda corresponda a tal conducta. En caso de que el Estado Libre Asociado de Puerto Rico, sus municipios, agencias o dependencias haya procedido con temeridad o frivolidad, el tribunal deberá imponerle en su sentencia una suma por concepto de honorarios de abogado, excepto en los casos en que esté expresamente exento por ley del pago de honorarios de abogado.

Por otro lado, el Artículo 27.165 del *Código de Seguros de Puerto Rico*, 26 LPRA sec. 2716e, regula todo lo relacionado a costas y honorarios de abogados en acciones instadas contra una aseguradora, en lo específico establece:

(1) Al recaer una sentencia o decreto por cualquiera de los tribunales contra un asegurador y en favor de cualquier asegurado nombrado o el beneficiario designado bajo una póliza o contrato ejecutado por el asegurador, el Tribunal de Primera Instancia o, en el caso de una apelación en la que prevalezca el asegurado o beneficiario, el tribunal de apelación, deberá adjudicar o decretar contra el asegurador y a favor del asegurado o el abogado del beneficiario una suma razonable como honorarios o compensación por haber procesado la demanda en la que se obtuvo una recuperación.

(2) En cuanto a las demandas basadas en reclamos que surjan de pólizas de seguro de vida o contratos de anualidad, no se aplicará dicha tarifa de abogado permitido si tal demanda se inició antes de la expiración

de sesenta (60) días después de la presentación de la prueba del reclamo debidamente presentada ante la aseguradora.

(3) Cuando se otorgue, la compensación u honorarios del abogado se incluirán en la sentencia o decreto dictado en el caso.

### III

Como primer señalamiento de error la apelante nos señala que erró el foro primario al declarar No Ha Lugar la demanda, pues la parte apelante alegó ser la acreedora de un remedio porque según la evidencia desfilada en el juicio quedó demostrado que la parte apelada incumplió con sus obligaciones según la póliza de seguros. No le asiste razón, veamos.

De entrada, antes de atender formalmente el primer señalamiento de error, debemos hacer hincapié en que la parte aquí apelante desistió[113] de su causa de acción en daños por violaciones al *Código de Seguros de Puerto Rico*, 26 LPRA sec. 101, por lo que atenderemos este señalamiento de error bajo la teoría de daños por incumplimiento contractual bajo el Código Civil de 1930.

Las acciones de daños por incumplimiento de contrato están fundamentadas en el incumplimiento de un deber que surge de la voluntad previa pactada entre las partes, por lo que su finalidad es que se cumplan aquellas promesas por las cuales las partes prestaron su consentimiento.[114] La parte promovente de una acción *ex contractu* debe probar la existencia de los daños alegados y del incumplimiento culposo o doloso de la obligación contractual.[115] Además de esos requisitos, debe existir una relación de causa y efecto entre el incumplimiento y los daños sobrevenidos.[116] Por otro lado, quienes en el cumplimiento de sus obligaciones incurran en

---

[113] Véase Apéndice del Recurso de *Apelación Civil*, págs. 402-403. Véase, además la Regla 39.1 de Procedimiento Civil, 32 LPRA Ap. V.
[114] Véase *Muñiz-Oliviari v. Steifel Labs.*, supra, pág. 818.
[115] *Íd.* pág. 819.
[116] *Íd.*

dolo, negligencia o morosidad quedarán sujetos a la indemnización de los daños y perjuicios causados por ésta.[117]

Tras evaluar el expediente judicial, las transcripciones de prueba oral y los escritos presentados por las partes, llegamos a la misma conclusión que el foro sentenciador en cuanto a que la parte apelante no desfiló prueba que nos demostrara que la parte apelada incumplió con sus obligaciones contractuales bajo la póliza, ni mucho menos sobre los alegados daños sufridos a raíz de éste. Al no quedar evidenciado el incumplimiento doloso o culposo contractual, el daño y una relación causal entre ambos, concluimos que no erró el foro primario al declarar No Ha Lugar la demanda y damos completa deferencia al Tribunal de Primera Instancia en su determinación final.

Como segundo señalamiento de error, la parte apelante nos señala que erró el foro sentenciador como cuestión de derecho al declarar No Ha Lugar la demanda, pues según estos el Tribunal de Primera Instancia impuso un estándar de prueba errado a la parte apelante para probar sus causas de acción y daños. No le asiste razón, veamos.

Según las Reglas de Evidencia de Puerto Rico, en los pleitos civiles el juzgador o juzgadora de los hechos emitirá una determinación mediante la preponderancia de la prueba a base de criterios de probabilidad, excepto cuando exista disposición, al contrario.[118] En los casos *ex contractu* la parte promovente de la acción debe establecer los siguientes requisitos: (1) el incumplimiento doloso o culposo contractual, (2) el daño y (3) una relación causal entre ambos.[119] Mientras que en los litigios de seguros, corresponde al asegurado el peso de establecer que su

---

[117] Véase Artículo 1054 del Código Civil de 1930, 31 LPRA sec. 3018.

[118] Véase, Regla 110 de Evidencia de Puerto Rico, 32 LPRA Ap. VI.
[119] Véase, *Muñiz-Oliviari v. Steifel Labs.*, supra, pág. 819.

reclamación está incluida dentro de las disposiciones del contrato de seguro, por su parte, la aseguradora tiene que evidenciar que aplica alguna exclusión.[120]

Al evaluar el expediente judicial, las transcripciones de la prueba oral y los argumentos presentados ante este foro, llegamos a la conclusión de que el foro primario no impuso un estándar de prueba errado a la parte apelante para probar sus causas de acción y daños.

En primer lugar, al revisar la *Sentencia*[121] emitida el 20 de julio de 2023, nos lleva a concluir que el foro primario tomó su determinación a luz del estándar de prueba utilizado para las acciones *ex contractu*, una acción civil, es decir preponderancia de prueba, lo que conlleva, a que el peso de la prueba de daños recae sobre la parte demandante, quién alega incumplimiento doloso o culposo contractual. En esta acción, la parte apelante no logró demostrar que la parte apelada incumplió con sus obligaciones contractuales bajo la póliza, ni mucho menos sobre los alegados daños sufridos a consecuencia de éste. Por lo que no vemos la imposición de un estándar errado aplicado a la parte apelante para establecer su causa de acción de daños por incumplimiento contractual bajo la póliza.

En segundo lugar, al revisar la *Sentencia*[122] emitida el 20 de julio de 2023, no vemos ningún indicio de que el foro primario haya impuesto un estándar de prueba errado para establecer el pago razonable para reparar o reemplazar aquellas áreas que sufrieron daños a causa del huracán María, conforme a la cubierta contenida en la póliza núm. 2017-12-02336. Lo cierto es, que el foro sentenciador sopesó la prueba presentada por la parte apelante

---

[120] Véase, *Rivera Matos et al. v. Triple-S et al.*, supra, pág. 1022.
[121] Véase, Apéndice del Recurso de *Apelación Civil*, págs. 731-771. Notificada y archivada en autos el 21 de julio de 2023.
[122] Véase, Apéndice del Recurso de *Apelación Civil*, págs. 731-771. Notificada y archivada en autos el 21 de julio de 2023.

sobre los daños ocasionados por el huracán María y los comparó con la prueba desfilada por la parte apelada, además de evaluar el ajuste de la reclamación realizado por el señor Omar Acevedo Avilés, y concluyó que los daños causados por el fenómeno atmosférico de María al Condominio Villas de Hato Tejas  cubiertos por la póliza de MAPFRE ascendieron a novecientos setenta mil seiscientos setenta y nueve dólares con setenta centavos ($970, 679.70).

En su tercer señalamiento de error la parte apelante nos plantea que erró el Tribunal de Primera Instancia en su apreciación de la prueba, al emitir determinaciones de hechos y derecho número 22, 34, 70, 81, 84, 89, 91, 92, 94, 98, 99, 106, 123, 124, 125, 137, 138, 141, 142, 145, 146, 152, 165, 174, 183, 185, 186, 187 y 188 que no se conforman según la prueba desfilada en juicio. De igual forma, nos plantea que erró el foro recurrido al no acoger las determinaciones de hechos propuestas por la parte apelante en su *Moción de Reconsideración y Solicitud de Determinaciones de Hechos y Derecho Adicionales.* [123] No le asiste razón.

Como cuestión de umbral, en nuestro ordenamiento jurídico, los foros apelativos debemos brindar deferencia a las determinaciones de hechos formuladas por los tribunales de instancia.[124] Esto es así pues los Tribunales apelativos no celebramos juicios plenarios, no presenciamos el testimonio oral de los testigos, ni dirimimos su credibilidad y no realizamos determinaciones de hechos, por ser una función de los foros sentenciadores.[125] Por esta razón, si no media error manifiesto, pasión, prejuicio o parcialidad y, por consiguiente, abuso de discreción, los Tribunales apelativos no intervendremos con

---

[123] Apéndice del Recurso de *Apelación Civil,* págs. 783-1395.
[124] Véase, *Serrano Muñoz v. Auxilio Mutuo,* supra, pág. 741.
[125] Véase, *Dávila Méndez v. Meléndez Marín,* supra. pág. 770.

aquellas determinaciones de hechos ni con la adjudicación de credibilidad que haya realizado el Tribunal de Primera Instancia.[126]

Tras revisar el legajo judicial y las transcripciones de prueba oral llegamos a la conclusión de que no erró el foro primario al realizar sus determinaciones de hechos pues estas se sustentaron con la prueba presentada en el juicio. Al no mediar error manifiesto, pasión, prejuicio o parcialidad damos completa deferencia al Tribunal de Primera Instancia en sus determinaciones y conclusiones.

Como cuarto planteamiento de error, la parte aquí apelante nos señala que erró como cuestión de derecho el foro primario en sus determinaciones y conclusiones de derecho en torno a la prueba pericial y valorización de los daños. No le asiste razón, veamos.

Como mencionamos anteriormente, en nuestro ordenamiento jurídico es norma reiterada que los foros apelativos debemos brindar total deferencia a las determinaciones de hechos y la adjudicación de credibilidad que haya realizado el Tribunal de Primera Instancia en ausencia de error manifiesto, pasión, prejuicio o parcialidad y, por consiguiente, abuso de discreción.[127] No pese a lo anterior, cuando las conclusiones de hecho realizadas por el foro de instancia estén basadas en prueba pericial o documental, los foros apelativos nos encontraremos en la misma posición que el Tribunal sentenciador, dándonos el poder de adoptar nuestro propio criterio en la apreciación y evaluación de la prueba pericial, y hasta para descartarla, aunque resulte técnicamente correcta.[128]

Por otro lado, las Reglas de Evidencia de Puerto Rico establecen que cuando el conocimiento científico, técnico o especializado le puede ser de asistencia a un juzgador o juzgadora

---

[126] Véase, *Mena Pamias v. Jiménez Melendez,* supra, pág. 774.
[127] Véase, *Serrano Muñoz v. Auxilio Mutuo,* supra, pág. 741; *Mena Pamias v. Jiménez Meléndez,* supra, pág. 774.
[128] Véase, *González Hernández v. González Hernández*, supra, pág. 777.

de hechos, para poder entender la prueba presentada o determinar un hecho en controversia, una persona testigo que ha sido capacitada como perita podrá testificar en forma de opiniones o de otra manera.[129] El valor probatorio que se le puede dar al testimonio vertido por la persona perita dependerá de, entre otros, (a) Si el testimonio está basado en hechos o información suficiente; (b) si el testimonio es el producto de principios y métodos confiables; (c) si la persona testigo aplicó los principios y métodos de manera confiable a los hechos del caso; (d) si el principio subyacente al testimonio ha sido aceptado generalmente en la comunidad científica; (e) las calificaciones o credenciales de la persona testigo, y (f) la parcialidad de la persona testigo.

Tras revisar las transcripciones de la prueba oral, los argumentos de las partes y la prueba documental presentada, no surge que el foro sentenciador haya cometido una evaluación errónea de la prueba pericial presentada, ni cometido error manifiesto, ni actuado con prejuicio ni con parcialidad. Concluimos, al igual que hizo el Tribunal de Primera Instancia, que el estimado presentado por la parte apelada era más razonable que el estimado presentado por la parte apelante.[130] De entrada, no nos convence como tribunal la idea de estimar daños de apartamentos que no fueron inspeccionados, mediante la metodología de extrapolación. Mucho más cuando incluso los propios peritos de la parte apelante, el señor Thomas Irmiter y el Ingeniero Roberto López han declarado que la inspección visual o física es más confiable que la extrapolación y que era posible llegar a conclusiones erróneas mediante el uso de la aludida metodología.[131] Por otro lado, nos convence la metodología utilizada por ROV y su perito, el Ingeniero

---

[129] Véase, Regla 702 de Evidencia de Puerto Rico, supra.
[130] Véase, Apéndice del Recurso de *Apelación Civil*, págs. 731-771. Notificada y archivada en autos el 21 de julio de 2023.
[131] Véase, TPO en las págs. 723, líneas 11-20; 935-936.

William Rosario Chárriez, para estimar daños, pues estos debían ver el daño para poder estimarlo, es decir, si no pudieron identificar el daño o no existía evidencia del mismo no se incluía en el informe.[132]

En su quinto señalamiento de error la parte apelante nos señala que erró el foro sentenciador al tomar conocimiento judicial de la *Sentencia*[133] emitida por el Tribunal de Primera Instancia Sala Superior de Aguada el 18 de octubre de 2024 en el caso número AU2019CV00515. No le asiste razón, en nuestro ordenamiento las Reglas de Evidencia de Puerto Rico permiten que un tribunal pueda tomar conocimiento judicial de un hecho adjudicativo.[134] Esto incluye los procedimientos celebrados y sentencias dictadas ante un tribunal dentro de la misma jurisdicción.[135]

En el caso ante nuestra consideración el foro primario tomó conocimiento judicial de la *Sentencia*[136] emitida en el caso número AU2019CV00515, pues la parte apelada mientras realizaba su contrainterrogatorio en el *voir dire* del perito señor Thomas Irmiter hizo alusión a la misma.[137] Según surge de la transcripción de la prueba oral del juicio celebrado en su fondo, el perito señor Thomas Irmiter fungió como perito en el caso número AU2019CV00515.[138] El hecho de que el caso número AU2019CV00515 se encontraba ante la etapa de apelación[139] no impedía al foro primario tomara conocimiento judicial de la *Sentencia*[140] pues se trajo para impugnar la credibilidad que el foro primario le pudiera dar al testimonio del perito señor Thomas Irmiter cuando aquilatara la prueba.[141]

---

[132] Véase, TPO en las págs. 1286-1288.
[133] Tomamos conocimiento judicial del Caso Núm. **AU2019CV00515** en el Sistema Unificado de Manejo y Administración de Casos (SUMAC), **Entrada Núm. 228**.
[134] Véase, Regla 201 de Evidencia de Puerto Rico, supra.
[135] Véase, *Asoc. de Periodistas v. González,* supra.
[136] Véase Caso Núm. **AU2019CV00515**, **Entrada Núm. 228**.
[137] TPO en la pág. 412, líneas 3-19.
[138] TPO en las págs. 407-411.
[139] Véase Caso Núm. **AU2019CV00515**, **Entrada Núm. 261** y **272.**
[140] Véase Caso Núm. **AU2019CV00515**, **Entrada Núm. 228**.
[141] TPO en las págs. 407-411.

Como sexto señalamiento de error, la parte apelante nos plantea que erró el foro primario al concluir que el ajuste de MAPFRE fue uno adecuado y admitirlo en evidencia, pues alegan que MAPFRE nunca presentó un perito en torno al ajuste y la evidencia demostró que el ajuste incumplió con el código de seguros. No le asiste razón.

Anteriormente mencionamos que cuando el conocimiento científico, técnico o especializado le puede ser de asistencia a un juzgador o juzgadora de hechos, para poder entender la prueba presentada o determinar un hecho en controversia, una persona testigo que ha sido capacitada como perita podrá testificar en forma de opiniones o de otra manera.[142] En nuestro ordenamiento jurídico se ha reconocido la posibilidad que en una sola persona se acumule el rol de testigo y perito simultáneamente.[143] Como parte de los tres tipos de peritos reconocidos, el Tribunal Supremo ha expresado que el perito de ocurrencia es aquel que ha adquirido información irremplazable pues han tenido una percepción inmediata de los hechos.[144]

Según surge de la transcripción de la prueba oral, el señor Omar Acevedo Avilés es un ingeniero civil que en la actualidad trabaja como ajustador *senior* en MAPFRE.[145] De igual forma posee varias licencias, entre ellas la licencia de ingeniero en entrenamiento desde el año 2003, licencia de *EIT*, y una licencia de ajustador II desde el año 2014, que le permite ajustar reclamaciones de líneas comerciales, marítimo terrestres y líneas excedentes.[146] Por otro lado, expresó que tomó cursos de propiedad comercial, un curso de reclamaciones catastróficas en condominios, de *business*

---

[142] Véase, Regla 702 de Evidencia de Puerto Rico, supra.
[143] Véase, *San Lorenzo Trad., Inc. v. Hérnandez*, 114 DPR 704, 713 (1983) (citas omitidas).
[144] *Íd.* en la pág. 718.
[145] Véase, TPO en la pág. 1619, líneas 19-22.
[146] Véase, TPO en la pág. 1620, líneas 6-19.

*interruption, claim* y sobre todas las pólizas personales, de propiedad, contenido y responsabilidad civil.[147] Testificó, además, contar con experiencia laboral en el CENSO, RIAX y en MAPFRE.[148] Que luego de ser investigador en MAPFRE, laboró como ajustador, en donde tramitó y ajustó reclamaciones de propiedad.[149]

De igual manera, según surge del *Informe de Conferencia con Antelación a Juicio,*[150] el señor Omar Acevedo Avilés fue anunciado como parte de la prueba testifical como "Ajustador de Mapfre quien testificará sobre el manejo de la reclamación, documentos que obran en el expediente de la reclamación, los términos y condiciones de la póliza de seguro y el ajuste". Según la transcripción de la prueba oral, el señor Omar Acevedo Avilés realizó el ajuste de la reclamación del Condominio Villas de Hato Tejas.[151]

Tras evaluar la prueba de transcripción oral, el legajo judicial, en específico el ajuste del 12 de febrero de 2021[152], no surge que el foro sentenciador haya cometido una evaluación y admisión errónea del ajuste realizado por el señor Omar Acevedo Avilés, ni cometido error manifiesto, ni actuado con prejuicio ni con parcialidad. Mucho menos que se haya incumplido con el *Código de Seguros de Puerto Rico*, por lo que damos completa deferencia al foro sentenciador.

Finalmente, como séptimo y último señalamiento de error, la parte apelante nos plantea que erró el foro primario al no otorgar una suma razonable de honorarios de abogados a favor de la parte apelante. No le asiste razón pues la parte aquí apelante no logró mostrar que la parte apelada actuó con temeridad o frivolidad conforme establece las Reglas de Procedimiento Civil de Puerto

---

[147] Véase, TPO en la págs. 1621-1622.
[148] Véase, TPO en la págs. 1622-1623.
[149] Véase, TPO en la pág. 1620, líneas 3-20.
[150] Véase, Apéndice del Recurso de *Apelación Civil,* pág. 220.
[151] Véase, TPO en la pág. 1630, líneas 3-16.
[152] Véase, Caso Núm. **BY2019CV05162**, Entrada Núm. 169**,** Anejo Núm. 15; Entrada Núm. 183, Anejo Núm. 3.

Rico.[153] De otro modo, debido a que la *Sentencia* emitida por el tribunal no recae contra la aseguradora, parte apelada, y en favor de cualquier asegurado, parte apelante, no procede la concesión de costas ni honorarios bajo el *Código de Seguros de Puerto Rico.*[154]

**IV**

Por los fundamentos antes expuestos, confirmamos el dictamen apelado.

Lo acordó y manda el Tribunal y lo certifica la Secretaria.


Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones

---

[153] Véase, Regla 44.1 de Procedimiento Civil de Puerto Rico, supra.
[154] Véase, Artículo 27.165 del *Código de Seguros de Puerto Rico*, supra.